743 F.2d 182
 53 USLW 2171
 PENNSYLVANIA ALLIANCE FOR JOBS AND ENERGY, Theresa J.
Crimone, Phillip Schuller, Jr., Miriam Imblum, and
Scott D. Hustead, Appellants,
v.
COUNCIL OF the BOROUGH OF MUNHALL, Chief of Police James
Coyne, Mayor William Knight, and Police Officers Thomas
Hilla and Richard Facchiano; Board of Supervisors of the
Township of Moon, Township Manager William P. Walsh, and
Chief of Police H. Thomas Krance; Town Council of the Town
of McCandless, Secretary Mary Kovacsics, Chief of Police
Patrick McCabe, and Patrolman William Fertig; Board of
Supervisors of Richland Township, Secretary Dean Bastianini,
Chief of Police James Hopper, and Police Lt. Richard Nalepa,
Appellees.
 Nos. 83-5510, 83-5759.
 United States Court of Appeals,
Third Circuit.
 Argued March 5, 1984.
Decided Sept. 10, 1984.
Rehearing Denied Oct. 16, 1984.
 
 Thomas R. Asher (argued), Ira R. Nerken, Washington, D.C., Thomas J. Kennedy, John Kissane Associates, St. Albans, Vt., Jon Pushinsky, Pittsburgh, Pa., for appellants; Thomas M. Cooley, II, Pittsburgh, Pa., of counsel.
 David Kairys, Kairys, Rudovsky & Maguigan, Philadelphia, Pa., for amici.
 Peter J. Taylor (argued), Arthur J. Murphy, Jr., Arthur J. Murphy, Jr. & Associates, P.C., Pittsburgh, Pa., for Council of Munhall, Richland Township, McCandless Township and Moon Township.
 Gene E. Arnold, Weaver, Willman & Arnold, Pittsburgh, Pa., for Township of Richland.
 James W. Dunn, Jr., Pittsburgh, Pa., for Township of McCandless, Kovacsics, McCabe, Fertig.
 Louis Silverhart, Pittsburgh, Pa., for Council of the Borough of Munhall, Chief of Police, J. Coyne, Mayor Wm. Knight, Police Officers, T. Hilla and R. Facchiano.
 Before HUNTER, BECKER, Circuit Judges, and HOFFMAN,* District Judge.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 This appeal arises from an order of summary judgment of the United States District Court for the Western District of Pennsylvania upholding the constitutionality of four local ordinances imposing time-of-day restrictions on and permit requirements for door-to-door solicitation. We will affirm the judgment of the district court.
 
 I.
 
 2
 The appellant, Pennsylvania Alliance for Jobs and Energy ("PAJE"),[1] is a non-profit charitable and educational organization working to influence energy policies. PAJE employees conduct door-to-door canvassing of homes in order to solicit funds and signatures on petitions.
 
 
 3
 Between September 1981 and March 1982, PAJE negotiated for canvassing permits from officials of the Pennsylvania towns of McCandless, Moon, Munhall, and Richland. PAJE received permits from all towns except Munhall, which exempted PAJE from its permit requirement. Each town advised PAJE that it would apply the time-of-day restrictions of its "transient vendor" ordinance to PAJE canvassers. Each of these transient vendor ordinances barred door-to-door canvassing after daylight hours, and two of them barred it after noon on Saturdays.[2]
 
 
 4
 Because PAJE prefers to conduct its door-to-door canvassing from 4:00 P.M. to 9:00 P.M., PAJE canvassers violated the time-of-day restrictions of each of the transient vendor ordinances in question. PAJE operations ceased in these towns after PAJE employees engaged in after-hours canvassing were issued citations and threatened with arrest in McCandless, Moon, and Munhall, and were arrested in Richland.
 
 
 5
 PAJE commenced this action against the four towns in April 1983, seeking a declaratory judgment that the ordinances violate the first and fourteenth amendments, and damages and injunctive relief under 42 U.S.C. Sec. 1983 (1982).[3] On June 8, 1983, the district court entered an order of summary judgment, holding that those ordinances barring door-to-door canvassing after 5:00 P.M. Monday through Saturday were constitutional time, place, and manner restrictions, but that the ordinances imposing earlier deadlines were unconstitutional under the first and fourteenth amendments.[4] The district court also held that the permit requirements imposed by the ordinances are constitutional.
 
 II.
 
 6
 We turn first to the question whether the prohibition of door-to-door canvassing after 5:00 P.M. Monday through Saturday violates the first and fourteenth amendments of the Constitution. Door-to-door canvassing for political and charitable purposes, while protected by the first amendment guarantee of freedom of speech, is subject to reasonable time, place, and manner restrictions. See Hynes v. Mayor of Oradell, 425 U.S. 610, 616-17, 96 S.Ct. 1755, 1758-59, 48 L.Ed.2d 243 (1976); Martin v. City of Struthers, 319 U.S. 141, 146-47, 63 S.Ct. 862, 864-65, 87 L.Ed. 1313 (1943). In concluding that the time-of-day provisions at issue are reasonable time, place, and manner restrictions, the district court applied the test of Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Under Heffron, time, place and manner restrictions are reasonable if they are imposed "without reference to the content of the regulated speech, ... serve a significant governmental interest, and ... leave open ample alternative channels for communication ...." Id. at 648, 101 S.Ct. at 2564. See Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 516, 101 S.Ct. 2882, 2897, 69 L.Ed.2d 800 (1981). PAJE argues that the district court erred in applying the Heffron "ample alternative channels of communication" standard rather than requiring that the time-of-day restrictions be the "least restrictive alternative" necessary to serve the governmental interest in question.
 
 
 7
 The applicability of the "least restrictive alternative" standard depends on whether, as PAJE contends, the time-of-day restrictions at issue are content-based and door-to-door canvassing is a public forum. In Tacynec v. City of Philadelphia, 687 F.2d 793 (3d Cir.1982), this court considered the standard by which time, place, and manner restrictions of first amendment activities are to be measured. We concluded there that the Heffron "ample alternative channels of communication" standard applies, unless the regulation in question is content-based. Then the more stringent "least restrictive alternative" standard is appropriate because, as Judge Adams noted, of the special "danger to First Amendment freedoms inherent in a content-based scheme of regulation." Id. at 798. See Frumer v. Cheltenham Township, 709 F.2d 874, 877 (3d Cir.1983). Restrictions of speech in public forums are also subject to heightened scrutiny under the first amendment. See, e.g., Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972); Hague v. C.I.O., 307 U.S. 496, 515-16, 59 S.Ct. 954, 963-64, 83 L.Ed. 1423 (1939). However, the Supreme Court has recently reiterated that viewpoint-neutral time, place, and manner restrictions of speech in non-public forums are to be measured by the Heffron "ample alternative channels of communication" test. See Members of the City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, ----, 104 S.Ct. 2118, 2133, 80 L.Ed.2d 772 (1984).
 
 
 8
 PAJE argues that the transient vendor ordinances that were applied to it are content-based because all of them exempt certain commercial activities from their coverage.[5] As applied, therefore, the ordinances' effect is to prohibit political and charitable canvassing at times when some commercial canvassing is permitted. This does not, however, render them content-based in the sense that triggers the "least restrictive alternative" standard. A regulation that is aimed at particular subject matters does not raise the spectre of government censorship as dramatically as one that is aimed at particular ideas or points of view. See Tacynec v. City of Philadelphia, 687 F.2d 793, 798 (3rd Cir.1982). At least in a non-public forum, a categorical proscription of political speech, even in a context where other types of speech are permitted, need not satisfy the "least restrictive alternative" standard so long as no viewpoint discrimination is present. See, e.g., Members of the City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, ----, 104 S.Ct. 2118, 2133, 80 L.Ed.2d 772 (1984); Greer v. Spock, 424 U.S. 828, 838-39, 96 S.Ct. 1211, 1217-18, 47 L.Ed.2d 505 (1976); Lehman v. City of Shaker Heights, 418 U.S. 298, 303-04, 94 S.Ct. 2714, 2717-18, 41 L.Ed.2d 770 (1974). The transient vendor ordinances in this case merely exempt certain commercial canvassing from regulations that extend to all other door-to-door canvassing, both commercial and non-commercial.[6] These exemptions are clearly viewpoint-neutral and do not mandate the "least restrictive alternative" standard.
 
 
 9
 PAJE also argues that the time-of-day restrictions must satisfy the "least restrictive alternative" standard because door-to-door canvassing is a "traditional" public forum. Door-to-door canvassing is clearly a traditional form of communication. See Martin v. City of Struthers, 319 U.S. 141, 145-46, 63 S.Ct. 862, 864-65, 87 L.Ed. 1313 (1943). Nevertheless, it is equally clear that not all traditional forums are public forums for purposes of first amendment analysis. In Members of the City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, ----, 104 S.Ct. 2118, 2133-34, 80 L.Ed.2d 772 (1982), the Supreme Court rejected a contention that public utility poles, traditionally used for posting political campaign signs, are a first amendment public forum. Similarly, in Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Court held that advertising space on public buses is not a public forum. Whether a place is a public forum depends on "the nature of the place [and] 'the pattern of its normal activities....' " Grayned v. City of Rockford, 408 U.S. 104, 118, 92 S.Ct. 2294, 2304, 33 L.Ed.2d 222 (1972) (quoting Wright, The Constitution and the Campus, 22 Vand.L.Rev. 1027, 1042 (1969)). Door-to-door canvassing takes place in private homes. The privacy of the home, and the obligation of government to protect that privacy, are entitled to particular solicitude from the courts. See, e.g., Carey v. Brown, 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980); F.C.C. v. Pacifica Foundation, 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978); Breard v. City of Alexandria, 341 U.S. 622, 644, 71 S.Ct. 920, 933, 95 L.Ed. 1233 (1951). Indeed, the Supreme Court has noted that, because of the countervailing privacy interests of householders, "[o]f all the methods of spreading unpopular ideas, house to house canvassing seems the least entitled to extensive protection." Hynes v. Mayor of Oradell, 425 U.S. 610, 619, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) (quoting Z. Chafee, Free Speech in the United States 406 (1954)). Door-to-door canvassing of private homes is plainly not a public forum such that time, place, and manner regulations of it must satisfy the "least restrictive alternative" standard.
 
 
 10
 We hold, therefore, that the district court was correct in applying the "ample alternative channels of communication" test to the time-of-day restrictions in this case.
 
 III.
 
 11
 PAJE also asserts that the district court erred in holding that the ordinances satisfy the Heffron test for time, place, and manner restrictions. PAJE argues that the time-of-day restrictions are not precisely drawn to serve a substantial governmental interest, and that they do not leave open ample alternative channels of communication.
 
 
 12
 The district court held the towns' interests in preventing crime and protecting the privacy of their residents sufficient to justify the time-of-day restrictions. The substantiality of these interests is beyond question. The Supreme Court has often recognized that a municipality has the "power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing." Hynes v. Mayor of Oradell, 425 U.S. 610, 616-17, 96 S.Ct. 1755, 1759, 48 L.Ed.2d 243 (1976). See Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73 (1980); Martin v. City of Struthers, 319 U.S. 141, 144, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943). Of course, even where a substantial state interest is articulated, a regulation that only peripherally protects that interest or that is not directly connected to the evil it is designed to prevent can hardly be justified as a necessary restriction of first amendment rights. Accordingly, regulations of door-to-door canvassing must be precisely drawn to serve the interests they are designed to further. See Secretary of State of Maryland v. Joseph H. Munson Co., --- U.S. ----, ----, 104 S.Ct. 2839, 2853, 81 L.Ed.2d 786 (1984); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980).
 
 
 13
 These ordinances' prohibition of door-to-door canvassing after daylight hours is intimately linked to the towns' interests in preventing crime. The district court found that each of the towns established a significant incidence of burglary and home invasion. That unregulated canvassing poses a risk of crime is well known: "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." Martin v. City of Struthers, 319 U.S. 141, 146, 63 S.Ct. 862, 864, 87 L.Ed. 1313 (1943). Indeed, the record in this case indicates that at least one of the towns has had experience with canvassers being involved in burglary and other crime. See App. at 358a-60a. The local authorities' task of detecting and preventing burglary would clearly be more difficult if strangers to their communities were permitted to roam from house to house after dark. The bans of door-to-door canvassing after dark directly and precisely serve the towns' interest in preventing crime.
 
 
 14
 The prohibitions of canvassing after 5:00 P.M. also directly further the towns' interest in protecting the privacy of their residents. "Preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuit, is surely an important value." Carey v. Brown, 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980). This value is clearly promoted by regulations that protect persons from the annoyance of coping with uninvited solicitors at the dinner hour and in the evening.
 
 
 15
 We hold, therefore, that the time-of-day restrictions in these ordinances are precisely tailored to serve the towns' substantial interests in preventing crime and protecting the privacy of their residents.
 
 
 16
 PAJE's final challenge to the time-of-day restrictions is that they fail to leave open alternative channels of communication because most people are away from their homes during the day on weekdays. The ordinances upheld by the district court specifically permit door-to-door canvassing during the day on Saturday. Moreover, none of the ordinances prevent PAJE from conducting personal solicitation in other forums, such as parks and shopping districts, or from proselytizing by telephone or mail. We therefore find PAJE's contention that it is left without adequate alternative channels of communication to be without merit.
 
 
 17
 Accordingly, we will affirm the district court's holding that the time-of-day provisions in these ordinances are reasonable time, place and manner regulations permissible under the first and fourteenth amendments.
 
 IV.
 
 18
 PAJE also challenges the definitional and licensing provisions of the ordinances on grounds of vagueness and overbreadth. First, PAJE argues that the definitional provisions of the transient vendor ordinances are unconstitutionally vague under the fourteenth amendment because they do not make express mention of charitable or political canvassing. We find this contention to be without merit. The due process vagueness doctrine mandates that laws provide fair notice of what conduct is proscribed. See Smith v. Goguen, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1973); Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). All of the transient vendor ordinances in this case are expressly applicable to "solicitation," as the district court noted. Moreover, each town notified PAJE in advance that it would be subject to the town's transient vendor ordinance. It is clear, therefore, that both the language of the ordinances and the interpretation given them by the agencies charged with enforcing them, see id. at 110, 92 S.Ct. at 2299, provided PAJE with the "fair notice" required by the due process clause.
 
 
 19
 PAJE attacks the licensing provisions of the transient vendor ordinances on the ground that they delegate unfettered licensing discretion to police officials by empowering them to withhold or revoke canvassing permits on the grounds of "public health, safety, or morals."[7] None of the towns denied canvassing permits to PAJE. Therefore, as the district court correctly determined, PAJE may only challenge the licensing provisions under the overbreadth doctrine, which permits a party to whom a law has constitutionally been applied to assert that it is so broad on its face as to chill the first amendment rights of others. A law aimed at conduct that may constitutionally be regulated, such as door-to-door canvassing, is facially invalid only if it is substantially overbroad. See Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). That is, there must be a "realistic danger" that the law in question "will substantially compromise recognized First Amendment protections of parties not before the Court ...." Members of the City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, ----, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). No such danger has been demonstrated in this case. There is no evidence that the licensing provisions have ever been administered in a manner that would chill first amendment rights. Compare Shuttlesworth v. City of Birmingham, 394 U.S. 147, 156-59, 89 S.Ct. 935, 941-43, 22 L.Ed.2d 162 (1969) with Cox v. New Hampshire, 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941). We therefore agree with the district court that the licensing provisions are not substantially overbroad.
 
 V.
 
 20
 For the foregoing reasons, we will affirm the judgment of the district court.
 
 
 21
 BECKER, Circuit Judge, dissenting.
 
 
 22
 The majority opinion reads convincingly until one scrutinizes the factual premises underlying the two principal bases of its constitutional analysis: the anti-crime justification for the statute and the existence of ample alternative channels of communication. In my view, these justifications do not pass constitutional muster on the record in this case. I reach the same conclusion with respect to the privacy justification relied on by the district court. Moreover, I believe that the majority's decision to uphold the ordinances in question is an unfortunate illustration of a growing trend in first amendment jurisprudence allowing municipalities to restrict significantly the forums for political communication available to poorly financed political groups. See Members of the City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).
 
 I. The Ordinances
 
 23
 I begin with a brief description of the ordinances in question. Although their details vary from town to town, the structure of the ordinances is uniform. They define certain "covered activities," which include door-to-door fund solicitation by political groups, and require organizations seeking to engage in the covered activities within the town to obtain a permit. Certain groups or activities are explicitly excluded from this requirement. The ordinances further limit the hours during which covered activities may take place, even with a permit. Activities not covered by the ordinances, or specifically excluded, may presumably take place at any time and without the need for a permit.[1]
 
 
 24
 In the town of Munhall, for example, the covered activities include general canvassing or soliciting for contributions. Specifically excluded, and thus permitted at all times and without a permit, are "boys or girls under sixteen years, who take orders for and deliver newspapers, greeting cards, candy, and the like, or who represent the Boy Scouts and Girl Scouts or similar organizations." The Munhall Chief of Police is authorized by the ordinances to deny permits to anyone whom he finds "injurious to the public interest, or to the public health, safety or morals." Once a permit is issued, covered activities, such as those engaged in by the plaintiffs in this case, may take place between 9:00 a.m. to 5 p.m., Monday to Saturday.[2]II. The Anti-Crime Justification
 
 
 25
 The majority upholds the ordinances from a first amendment attack brought by the plaintiff organization by finding that the ordinances prevent crime. Burglars, it is explained, may pose as canvassers in order to "canvass" a neighborhood for unoccupied homes. By banning canvassers after dark (at which time the burglars impersonating canvassers are supposedly less conspicuous) the towns hope to reduce crime. In the majority's view, this justification for the statute is adequate not only in the abstract, but also as applied, because of the specific problems faced by the towns--problems, which it is alleged, are revealed by the record.
 
 
 26
 I find a simple anti-crime rationale for the ordinances in question highly dubious as a legal proposition, and unsupported by the record in this case. To begin with, there is no evidence that the towns face a high crime rate, or that any sort of emergency justifies this curfew on political activity. The only shred of relevant evidence is that, at some point in time that the Chief of Police could not even remember, someone in Munhall who posed as a Bible salesman was seen breaking into a house.[3] This isolated incident simply does not support the district court's finding that "each of the towns established a significant incidence of burglary and home invasion," or the majority's conclusion that the "ban of door-to-door canvassing after dark directly and precisely serve the town's interest in preventing crime."[4]
 
 
 27
 Just as important as the lack of any significant factual foundation for the anti-crime rationale as it applies to these ordinances is the theoretical infirmity of reliance on the vague and speculative fear of crime as a basis for prior restraints on speech. It may well be true that the "local authorities' task of detecting and preventing burglaries would clearly be more difficult if strangers to their communities were permitted to roam from house to house after dark;" but to allow this undefined additional burden on local law enforcement to justify a significant restriction on free expression is a dangerous precedent indeed. As the Supreme Court has stated in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969), "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." While the likelihood of such legislation is remote, on a conceptual level it is unclear to me, for example, why a similar justification could not be used by a town to prohibit the presumably less protected evening constitutional, a visit with neighbors, or a New Year's Eve party. In short, the anti-crime rationale proves too much. We live in a dangerous age, to be sure, but safety stripped of the freedom to enjoy its fruits becomes a sad form of solitude.
 
 
 28
 In support of its anti-crime rationale, the majority also cites Martin v. City of Struthers, 319 U.S. 141, 144, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943), for the proposition that "burglars frequently pose as canvassers," and Hynes v. Mayor of Oradell, 425 U.S. 610, 616-17, 96 S.Ct. 1755, 1759, 48 L.Ed.2d 243 (1976), for the proposition that a municipality has the "power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing." Several factors, however, lead me to the belief that these cases do not predetermine the constitutionality of the ordinances under attack here. First, the statement in Martin is clearly dictum. In Martin the Supreme Court struck down an ordinance prohibiting door-to-door canvassing despite the presence of an anti-crime rationale. In addition, I cannot regard a statement made by the Court in 1943 about the modus operandi then in vogue among felons as significantly enhancing the strength of an otherwise insufficient factual record on the question. The Supreme Court did not hold, as a matter of law, that "burglars pose as canvassers." Cf. Democratic Party v. National Conservative Political Action Committee, 578 F.Supp. 797, 823 (E.D.Pa.1983) (three-judge court), prob. juris. noted --- U.S. ----, 104 S.Ct. 1906, 80 L.Ed.2d 455 (1984). Certainly the record does not support such a conclusion for the four towns involved in this litigation.
 
 
 29
 The quotation from Hynes is somewhat less troubling. Neither the plaintiff in this litigation nor the most zealous first amendment advocate would contend that towns do not have authority under the police power to protect citizens either from crime or "undue annoyance." The issue, however, is the means by which a town may constitutionally achieve that objective. To support a restriction on political speech, a more direct and substantial relationship between the fear of crime and the restrictive ordinance must be shown. Tinker, 393 U.S. at 508, 89 S.Ct. at 737. In sum, while I agree that prevention of crime is a significant state interest within the meaning of Heffron v. International Society for Krishna Consciousness, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), the majority's anti-crime rationale is not supported by the record and may not be established by an ipse dixit. Cf. Ad World, Inc. v. Doylestown, 672 F.2d 1136 (3d Cir.1982) (rejecting anti-crime rationale of ordinance banning door-to-door delivery of advertising tabloid).
 
 III. The Privacy Justification
 
 30
 Having found the majority's major justification for the ordinances unpersuasive, I must now address what I regard to be the defendants' stronger argument: that the ordinances protect individual privacy. Were all the ordinances involved in this litigation viewpoint neutral, the asserted privacy rationale might justify the ordinances, provided ample alternative forums remained available. Few would quarrel, for example, with an ordinance that barred all door-to-door solicitation at three o'clock in the morning. The interest in residential privacy served by such an ordinance could conceivably be served equally well by passage of a criminal trespass ordinance that conditioned enforcement upon each homeowner posting a "No Trespassing After 3 AM" sign. However, given the consequent aesthetic problems, it would seem absurd to require residents to post such signs by striking down an ordinance making door-to-door solicitation presumptively unlawful at that time of morning. But cf. Martin v. City of Struthers, 319 U.S. 141, 143-44, 63 S.Ct. 862, 863-64, 87 L.Ed. 1313 (1943).
 
 
 31
 It is unclear at what time the privacy interests that would lead us to sustain that type of ordinance begin to outweigh the first amendment interests of those who desire to solicit in the evening hours; I might well, for example, find an ordinance that barred all solicitation after 9 p.m. to be justified by such privacy interests. I need not confront that question here, however, since the ordinances in question here place significantly greater restraints on free expression.
 
 A. Viewpoint Neutrality
 
 32
 One of the ordinances we confront on this appeal is not viewpoint neutral. By its specific exclusion for favored yet equally disruptive intrusions, the Munhall ordinance is patently viewpoint-based. While it is probably true that fewer people would be annoyed by Girl Scouts ringing the doorbell at 8 p.m. in order to sell cookies than by a grown representative of the plaintiff organization engaging in similar canvassing to obtain support for its politically controversial message, the distinctions based on these ephemeral preferences of the public destroy the viewpoint neutrality on which the majority relies in subjecting these ordinances to the deferential Heffron test.[5]
 
 
 33
 Because the Munhall ordinance is viewpoint-based, it may be sustained only if it furthers a compelling governmental interest and if there is no less restrictive means by which that interest can be advanced. Carey v. Brown, 447 U.S. 455, 461-462, 100 S.Ct. 2286, 2290-2291, 65 L.Ed.2d 263 (1980). No one has suggested that any of the ordinances at issue in this case could meet this rigorous standard. Perhaps Munhall could ban all solicitations in order to protect the privacy of its residents during dinner hours[6]--and perhaps if the majority adopted my position it would do so--but it cannot, in my view, legislate which forms of "disruption" may be subject to criminal liability and which forms may not, at least as long as the regulated "disruptions" are free speech within the meaning of the first amendment.[7]
 
 
 34
 The ordinances of McCandless, Richland and Moon are not clearly viewpoint-based. To be sure, each contains numerous exclusions which suggest that their residents' concerns about "privacy" vary according to the popularity or political clout of the invading group. McCandless, for example, bars door-to-door sales after permitted hours by those soliciting funds for any religious, charitable or non-profit cause, and by vendors from out of town, but allows after-hours, door-to-door sales by those who have a residence or business office within the town.[8] Richland bars after-hours retail sale of goods along with its ban on door-to-door solicitations for political causes, but allows sales of milk and bakery products to be conducted door-to-door at all hours. Moon bars solicitation of funds for any charitable, religious or non-profit cause, as well as personal solicitations of merchandise, but allows after-hours solicitations by sellers of meat, "truck gardeners" and other favored groups. It would be difficult, however, to attribute any political import to these exemptions. The milkman usually collects money for milk, not to support lobbying efforts for dairy price supports. The ordinances do favor commercial solicitation over political solicitation,[9] and, in light of this discrimination, I am somewhat less confident than the majority that this discrimination does not render the ordinances subject to the strictest form of scrutiny:[10] however, for purposes of argument I am willing to assume that the majority is correct in its use of the Heffron test for evaluating these restrictions on speech.
 
 B. Ample Alternatives
 
 35
 Assuming that the McCandless, Richmond, and Moon ordinances are viewpoint-neutral (or even that the Munhall Ordinance is viewpoint-neutral), I still cannot join in the result reached by the majority. The majority opinion simply asserts that, because the ordinances permit door-to-door canvassing during the day on Saturdays,[11] because the plaintiff organization can personally solicit in other forums, such as parks and shopping districts, and because the plaintiff organization can proselytize by telephone or mail, plaintiff's "contention that it is left without adequate alternative channels of communication [is] without merit." This reasoning is flawed.
 
 
 36
 The majority has not cited any evidence in the record supporting its conclusions about the availability of alternative forums, or their utility as substitutes for canvassing door-to-door during the hours of the early evening. As far as I can discern, no such evidence exists.[12] The majority, therefore, has either taken judicial notice, based on some special knowledge about the habits of individuals residing in the defendant towns, of the adequacy of the alternative forums, or it has placed the burden of proof on the plaintiffs to show that ample alternatives do not exist.[13] Neither course is appropriate. The first improperly involves the appellate court in fact finding on disputed matters. More importantly, the second places the burden on the wrong party. In my view, the burden should be on the government body that restricts political speech by passing a viewpoint-neutral regulation to demonstrate that ample alternative forums for communication exist. Accord, State v. Today Newspapers, 183 N.J.Super. 264, 271, 443 A.2d 787, 790 (1982). Although I have found no federal cases directly allocating the burden of persuasion concerning the availability of ample alternative forums for communication, language in Perry Educ. Ass'n v. Perry Local Educators' Assn, 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983), and other cases suggests that the burden should be on the government body.
 
 
 37
 In Perry, the Court declared that, for content-based regulations, the state has the burden to prove that the regulations further a compelling state interest and are narrowly tailored to further that interest. Id. 103 S.Ct. at 955. The Court then discussed content-neutral time, place, and manner regulations, saying that such regulations must be narrowly tailored to serve a significant state interest and leave open ample alternative channels of communication. Id. While the Court did not explicitly state on whom the burden of proof lay to show the existence of such alternative, the Court's intention seems clear--that the burden lies on the state. Indeed, in Linmark Associates Inc. v. Willingboro, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), the Court, in striking down a ban on certain signs, because ample alternative forums did not exist, found "respondents' effort to defend the ordinance on this ground [that it restricted only one method of communication] ... unpersuasive," (emphasis added) Id. at 93, 97 S.Ct. at 1618, again suggesting that the burden lies on the state.[14] Logic compels me to conclude that if the government body must bear the high burden of proving that a content-based regulation serves a compelling state interest and is narrowly drawn, Perry, 103 S.Ct. at 955, it should also bear the burden of proving that a content-neutral time, place, and manner regulation provides ample alternative opportunities for speech.[15]
 
 
 38
 The defendant towns have not met their burden of showing that ample alternative forums for communication remain open to the plaintiff organization. First, although subject to criticism in some Supreme Court cases, see Breard v. City of Alexandria, 341 U.S. 622, 639 & n. 27, 640, 71 S.Ct. 920, 931 & n. 27, 931, 95 L.Ed. 1233 (1951), and subject to high praise in others, see Martin v. City of Struthers, 319 U.S. 141, 145-46, 63 S.Ct. 862, 864-65, 87 L.Ed. 1313 (1943), door-to-door solicitation is clearly a unique form of communication in our democracy, one for which few substitutes exist, particularly among those unable to buy their way into the home through purchase of radio or television time or direct mail.[16] When out on the street, the solicitor confronts individuals who are generally engaged in the commerce of the day and unwilling to exchange in any prolonged discussion. Moreover, away from one's "home turf," the average individual may often feel threatened by a stranger coming at him or her and promoting unusual ideas. The public park has similar deficiencies, and is often a poor site for engaging individuals in one-on-one discussions of the ideas of the day. Today's private shopping mall may bar solicitors, see Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), and, again, because those in it are generally busy, provides an avenue of communication with limited utility. At all events, the record is barren of evidence of the existence of shopping centers and parks in these towns. See supra n. 12 and accompanying text.
 
 
 39
 The home, by contrast, has special advantages. Precisely because the homeowner may slam the door in the solicitor's face the moment he or she feels threatened by either the solicitor or his ideas, and precisely because the home is often a place of quiet where the homeowner may have the time to engage in some prolonged discussion, it is a particularly valuable forum for communication. It is of course true, as the majority notes, that the defendant towns have not barred door-to-door solicitation but have merely limited the hours during which it may take place. The question, however, is whether the limitations are too stringent. By eliminating evening solicitation (or even late afternoon solicitation as in Munhall), the ordinances prevent the plaintiff organization from reaching significant segments of the population who are not at home during the day. And while the ability to solicit on Saturday provides some relief from this restriction, it strikes me as inadequate. Restricted to Saturdays, the plaintiff organization, with its finite number of members, may well be unable to reach most of those who are at home on Saturdays but not on weekdays. Many of these same people are at home during the weekday evenings and could be reached if canvassing were allowed on weekdays and evenings. Moreover, many who would be at home during weekday evenings and thus accessible to the plaintiff organization will be away on Saturdays, especially in the summertime.[17]
 
 
 40
 In my view, absent evidence to the contrary from the defendants, I do not believe they have met their burden of establishing that the forums for communication left open to the plaintiff organization are ample.
 
 IV. Conclusion
 
 41
 In sum, I would strike down the Munhall ordinance on the grounds that it unlawfully discriminates on the basis of viewpoint without any compelling governmental interest, and would strike down the Moon, McCandless and Richland (and Munhall) ordinances on grounds that they fail to provide ample alternative channels of communication to the plaintiff organization. Therefore, I respectfully dissent.[18]
 
 
 
 *
 Honorable Walter E. Hoffman, United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The individual appellants are PAJE employees who were either arrested or cited for violations of the ordinances in question
 
 
 [2]
 The transient vendor ordinances applied to PAJE were McCandless Ordinance No. 837, Moon Ordinance No. 96, Munhall Ordinance No. 1190, and Richland Ordinance No. 73. McCandless Ordinance No. 837 permits canvassing 9:00 A.M. to 5:00 P.M. Monday through Sunday from October 1 to April 30, and 9:00 A.M. to 9:00 P.M. May 1 to September 30. Moon Ordinance No. 96 permits canvassing 9:00 A.M. to 4:00 P.M. Monday through Friday and 9:00 A.M. to 12:00 P.M. on Saturday. Munhall Ordinance No. 1190 permits canvassing 9:00 to 5:00 P.M. Monday through Friday and 9:00 A.M. to 12:00 P.M. on Saturday. Richland Ordinance No. 73 permits canvassing 9:00 A.M. to 6:00 P.M. Monday through Sunday
 After PAJE canvassing ceased in McCandless and Moon, these towns passed ordinances specifically covering door-to-door canvassing and solicitation by charitable and political organizations. McCandless Ordinance No. 820 permits such canvassing from 9:00 A.M. to 5:00 P.M. Monday through Friday year-round: Moon Ordinance No. 227 permits it from 9:00 A.M. to 5:00 P.M. Monday through Sunday October through April and from 9:00 A.M. to 9:00 P.M. Monday through Sunday May through September.
 The district court addressed the constitutionality of the time-of-day provisions of all six ordinances. PAJE did not challenge the bans of Sunday canvassing and accordingly the district court did not address that issue, nor do we here.
 
 
 [3]
 PAJE also brought a pendent state claim for false arrest, which is still pending before the district court
 
 
 [4]
 No cross-appeals have been filed by the towns
 
 
 [5]
 See, e.g., Munhall Ordinance No. 1190, Sec. 6 (exempting "boys and girls under the age of sixteen (16) years, who take orders for and deliver newspapers, greeting cards, candy, and the like, or who represent the Boy Scouts and Girl Scouts or similar organizations who take orders for and deliver cookies and the like, or who represent the Boy Scouts or Girl Scouts or similar organizations and take orders for and deliver cookies and the like.")
 The dissenting opinion concludes that because the Boy Scouts and Girl Scouts represent "traditional values," their inclusion in this exemption renders the Munhall ordinance "patently viewpoint-based." What this conclusion fails to take note of is that the Munhall exemption is available to all children under age sixteen who sell or deliver items such as newspapers and cookies. We think it clear that, far from evincing a design to promote "traditional" views at the expense of controversial ones, Munhall has simply recognized that there are certain types of door-to-door activities that children customarily engage in, and has come to the conclusion, which we cannot second-guess, that these children pose a lesser risk of crime than adults do.
 
 
 [6]
 These ordinances are thus distinguishable from those condemned by the plurality in Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). The ordinances at issue in Metromedia not only entirely banned most non-commercial billboards at some sites while permitting commercial billboards, but also discriminated in favor of some types of non-commercial advertising. Id. at 513-14, 101 S.Ct. at 2895-96
 
 
 [7]
 Munhall Ordinance No. 1190, Sec. 3; McCandless Ordinance No. 820, Sec. 305.05: Richland Ordinance No. 73, Sec. 5. Moon Ordinance No. 96, Sec. 2, provides that "the Department of Police may issue ... a Certificate of Compliance" to any applicant who submits a written request, a photograph of himself, and who is fingerprinted by the police
 
 
 [1]
 In McCandless and Richland, the "covered activities" include "the conducting of retail sales" by "transient vendors" and soliciting funds for religious, charitable, or non-profit causes. Exempted from the category of covered activities are sales of milk or bakery products and all door-to-door solicitation by persons who have a residence or business office within the town. In McCandless, persons who have been convicted of any felony or misdemeanor involving moral turpitude may be prohibited from soliciting altogether. In Richland, the Chief of Police and Board of Supervisors may revoke a permit if it is deemed "beneficial to the public health, safety or morals." Those wishing to undertake covered activities and who have obtained the requisite permissions may do so in McCandless from 9 a.m. to 5 p.m. from October 1 to April 30. In summer (May 1 to September 30), soliciting hours are extended to last from 9 a.m. to 9 p.m. In Richland, the hours are 9 a.m. to 6 p.m. In Moon, covered activities include sales and offers to sell by personal solicitation and from house to house "any goods, wares, merchandise, literary productions, magazines, periodicals, fruits, fish, vegetables, produce, oysters, milk or any articles of trade whatsoever." As in McCandless, covered activities in Moon also include solicitation of funds for religious, charitable or non-profit causes. Exempted, among others, are persons "selling personal property at wholesale to dealers in such articles," newsboys, merchants delivering in the regular course of business, truck gardeners, or manufacturers or producers in the sale of bread, meat or milk. After extensive application procedures, including fingerprinting, submission of photographs and references, the Chief of Police may issue the required permits and identification cards to any person except one convicted of a felony or misdemeanor involving moral turpitude. The Munhall ordinance is discussed in the text
 
 
 [2]
 The Munhall ordinance actually states that canvassing is allowed on Saturdays between the hours of 9:00 a.m. and 12:00 noon only. The district court declared the Munhall ordinance unconstitutional partly because of this 12:00 noon cut-off, and Munhall has taken no objection to this ruling. I therefore assume that Munhall permits soliciting until 5:00 p.m. on Saturdays
 
 
 [3]
 I note further that the Munhall Chief of Police recalled that this event occurred at noontime. This testimony further diminishes the value of this isolated incident in supporting a crime-prevention rationale for a restriction on night-time canvassing
 
 
 [4]
 Even if there were factual support in the record for the assertion that the ordinances prevent crime by lessening the ability of burglars to pose as canvassers after dark, the ordinances of Munhall and Richland are too broad. During the summer months in Pennsylvania, it is amply light until at least 8 or 9 p.m. Yet the Munhall ordinance cuts off soliciting at 5 p.m. throughout the entire year, and the Richland ordinance cuts it off at 6 p.m. Thus, unless one accepts a privacy rationale, see infra, there is no significant interest in these aspects of Munhall's and Richland's ordinances. Moon and McCandless, by contrast, have at least tailored their anti-solicitation ordinances to take account of the longer daylight periods during the summer months. See Grayned v. City of Rockford, 408 U.S. 104, 116-17, 92 S.Ct. 2294, 2303-04, 33 L.Ed.2d 222 (1972) ("regulation must be narrowly tailored" to further the asserted state interest)
 
 
 [5]
 Implicit in my comment on this point is that the Girl Scouts, although assuredly wholesome and unobjectionable to almost all, nonetheless request support for certain traditional values when they solicit for funds. I believe it to be discriminatory when, as in Munhall, the Girl Scouts, Boy Scouts and "similar organizations" may ask for financial support for their efforts in appropriately inculcating and educating youth as to important values, but when representatives of other organizations, with less traditional views, cannot solicit door-to-door at similar times. Whatever may be said about the justification for the exception for groups, such as the girl scouts, under the "anti-crime" rationale, the exception cannot be justified under the privacy rationale, since all disruptions are equally violative of the privacy interests of homeowners
 
 
 [6]
 The district court relied on this justification in upholding the ordinances, but the majority eschewed it
 
 
 [7]
 In so stating, I do not mean to pass on the constitutionality of a traditional anti-trespass ordinance as applied to a solicitor who entered on property marked, for example, "Republicans only." My point is that the legislature cannot mandate such discrimination for all citizens. See Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); cf. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)
 
 
 [8]
 I shall not speculate on whether this discrimination violates the commerce clause or the privileges and immunities clause of Article IV
 
 
 [9]
 The ordinances also favor certain forms of commercial solicitation over other forms, but I do not believe that the plaintiffs have standing to complain about the discrimination among forms of commercial solicitation. Bates v. State Bar of Arizona, 433 U.S. 350, 380-81, 97 S.Ct. 2691, 2707-08, 53 L.Ed.2d 810 (1977)
 
 
 [10]
 Two of the cases cited by the majority in support of its view that this sort of favoritism is not "content" or "viewpoint"-based. Greer v. Spock, 424 U.S. 828, 838-39, 96 S.Ct. 1211, 1217-18, 47 L.Ed.2d 505 (1976) and Lehman v. City of Shaker Heights, 418 U.S. 298, 303-04, 94 S.Ct. 2714, 2717-18, 41 L.Ed.2d 770 (1974), do not provide the strongest support. Greer dealt with political speech on military bases, which, to my mind, is a rather special case. The plurality opinion in Lehman justified the ban on political advertising on buses on grounds that the bus rider was a captive audience. Nonetheless, I agree that it is difficult to distinguish comments in Members of the City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, 104 S.Ct. 2118, 2133, 80 L.Ed.2d 772 (1984)
 
 
 [11]
 The Munhall ordinance originally prohibited Saturday afternoon canvassing, but the district court declared that aspect of it to be unconstitutional, and Munhall has not appealed. See supra note 2
 
 
 [12]
 We do not know, for example, whether these towns have shopping districts or parks or the percentage of unlisted phone numbers therein, or the cost of mail or other communication
 
 
 [13]
 In fairness, it must be noted that the district court also stated that ample alternatives for communication existed and it may be that the majority is simply declining to hold this finding clearly erroneous. If so, the majority simply repeats the error of the district court in placing the burden of proof on the plaintiffs to show that ample alternatives do not exist and then finding that the plaintiffs have not discharged their burden. See discussion infra
 
 
 [14]
 We realize, of course, that Linmark concerned commercial, not political speech. However, since a state may impose time, place, and manner regulations on commercial speech, as on non-commercial speech, only if ample alternatives exist, Linmark is not inapposite. Indeed, if the burden is on the state in commercial speech cases, the greater protection afforded non-commercial speech. Central Hudson Gas v. Public Service Commission of New York, 447 U.S. 557, 562-63, 100 S.Ct. 2343, 2349-50, 65 L.Ed.2d 341 (1980), implies that the burden lies on the state in the case of political speech
 
 
 [15]
 My conclusion that the burden should be on the government body to show an ample alternative forum finds support in the following illustration, which is doubtless mirrored in the ordinances of many towns in America. Assume that a town passes numerous restrictive ordinances, such as those preventing the posting on telephone poles, or those limiting the time of door-to-door canvassing, or those limiting the times and places for demonstrations in public parks. Taken individually, each of these regulations is relatively harmless, but if they are enacted cumulatively in a given geographical area, they will seriously infringe upon the speech rights of those unable to afford the more expensive methods of communication. See Martin v. City of Struthers, 319 U.S. 141, 146, 63 S.Ct. 862, 864, 87 L.Ed. 1313 (1943) ("Door to door distribution of circulars is essential to the poorly financed causes of little people.") The passage of such ordinances in succession can create a special problem, in that there is a danger that, in practical terms, the "ample alternatives" test subjects only the last ordinance passed to constitutional attack, while potentially more serious and vulnerable but earlier enacted regulations infringing speech rights remain intact. In such a situation, the plaintiff has virtually been painted into a corner. It therefore seems unfair to impose the burden of demonstrating ample alternatives upon him, and fair to impose it on the government body promulgating the ordinances
 
 
 [16]
 Even for those who can afford other means of communication, door-to-door solicitation may have special advantages because of the personal contact involved
 
 
 [17]
 Although I too must go outside the record in order to support my position with scientific, as opposed to experiential data, I note that there is some evidence supporting my view. A study conducted in 1976 by the Research Triangle Institute and a study conducted in 1972 by the United States Bureau of the Census, an organization presumably expert in door-to-door solicitation, show that the probabilities of reaching many individuals via door-to-door solicitation increase substantially when canvassing is conducted in the evening hours. According to the 1976 survey, the odds of reaching at least one member of a household range from 0.39 and 0.57 between 9 a.m. and 5 p.m. on weekdays. Between 5 p.m. and 10 p.m. on weekdays, the probabilities range from 0.58 to 0.68. See Weeks, Optimal Times to contact Sample Households, 44 Public Opinion Q. 101, 107 (Spring 1980) (table 3b). And it is indubitable, given the vastly increased number of women in the work force since 1976, that the 1976 estimate of the number of people home during the day is greatly inflated. Moreover, according to data from the 1972 survey conducted by the Census Bureau, a solicitor in a town without restrictive ordinances could be 50 percent more effective. See United States Bureau of Census, Who's Home When (1972). As the Census Bureau concluded, "It would be most unproductive to use the morning and early afternoon hours for anything but callbacks" in an attempt to reach young men. In fairness, however, it must be noted that the Census Bureau did not attempt to calculate what effect the availability of Saturday soliciting might have on its conclusion
 
 
 [18]
 I concur in the judgment of the majority insofar as it holds that the plaintiffs do not have standing to challenge the procedures whereby the local chiefs of police can deny permits to groups "injurious to the public morals" (a standard that would appear to be of doubtful constitutionality, to say the least), and insofar as it holds that the ordinances are not unconstitutionally vague