797 F.2d 1250
 55 USLW 2093
 NEW JERSEY CITIZEN ACTION and the New Jersey League of
Conservation Voters, Appellants,
v.
EDISON TOWNSHIP, Glen Ridge Township, Harrington Park
Borough, North Arlington Borough, Town of Nutley, Paramus
Borough, Piscataway Township, Roseland Borough, Woodbridge
Township and Woodcliff Lake Borough.
PARAMUS CITIZENS FOR A NUCLEAR WEAPONS FREEZE, Plaintiff Intervenor,
v.
PARAMUS BOROUGH, Defendant.
 No. 85-5321.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 18, 1986.
Decided Aug. 5, 1986.
Rehearing and Rehearing In Banc Denied Sept. 25, 1986.
 
 Frank Askin (argued), Eric Neisser, Constitutional Litigation Clinic, Rutgers Law School, Newark, N.J., for New Jersey Citizen Action and Paramus Citizens for a Nuclear Weapons Freeze, on behalf of the American Civil Liberties Union.
 Timothy Haley, Gordon & Gordon, West Orange, N.J., for League of Conservation Voters; Thomas Asher, Washington, D.C., of counsel.
 Phillip Lewis Paley (argued), Lionel J. Frank, Kirsten, Friedman & Cherin, P.C., Newark, N.J., for Tp. of Piscataway.
 Lawrence P. Pollex, Edison, N.J., for Edison Tp.
 James Randall Stevens, Westwood, N.J., for Woodcliff Lake.
 Daniel P. Mecca, Paramus, N.J., for Borough of Paramus.
 Arthur W. Burgess, Woodbridge, N.J., for Woodbridge Tp.
 Edwin C. Eastwood, Jr., North Bergen, N.J., for Borough of North Arlington.
 David Kairys, Kairys & Rudovsky, Philadelphia, Pa., for amici curiae--Pennsylvania Public Interest Coalition, Republican City Committee of Philadelphia, Americans for Democratic Action and Friends of Bob Edgar--for appellants.
 Before WEIS and SLOVITER, Circuit Judges, and POLLACK, District Judge*.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 This appeal arises out of a suit brought under 42 U.S.C. Sec. 1983 by three political action groups against ten New Jersey municipalities, alleging that the municipalities' ordinances regulating door-to-door canvassing and solicitation violated rights protected by the federal and New Jersey constitutions. The district court upheld the challenged provisions against the federal constitutional challenge and dismissed the pendent state claim.
 
 I.
 FACTUAL BACKGROUND
 
 2
 Appellants are New Jersey Citizen Action (NJCA), the League of Conservation Voters (Conservation League), and Paramus Citizens for a Nuclear Weapons Freeze (Paramus Freeze) (hereafter collectively referred to as "citizens groups"). NJCA, a political action federation of individuals and organizations, including trade unions, church groups, and senior citizen associations, engages in educational, research, canvassing, and citizen lobbying activities to find legislative and political solutions for problems of public concern in New Jersey, such as energy costs, taxes, toxic waste and unemployment. Conservation League, a national political action committee which maintains an office in New Jersey, educates the public and lobbies legislative bodies about environmental issues. Paramus Freeze is an unincorporated association working to increase public support for a nuclear weapons freeze; its activities are limited to Paramus.
 
 
 3
 All of these organizations use door-to-door canvassers to present their programs to citizens, to receive citizens' viewpoints, and to raise funds. The district court found that NJCA and Conservation League raise over 80% of their funds through canvassing. These organizations hire as canvassers mostly young people who are paid a salary, which is conditioned on their meeting a preset fundraising goal. Paramus Freeze has mostly older canvassers who are all volunteers. The NJCA and Conservation League canvassers canvass only from 4 p.m. to 9 p.m.
 
 
 4
 The citizens groups[1] originally filed suit against ten New Jersey municipalities,[2] alleging that the sections of the municipal ordinances that regulate door-to-door solicitation and canvassing violate plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution and similar guarantees of the New Jersey constitution. Although temporary restraining orders were issued against two towns, the district court ultimately merged the citizens groups' request for a preliminary injunction against all defendants with a trial on the merits, limited to the claim for injunctive relief. It reserved the issues raised by plaintiffs' claims for money damages.
 
 
 5
 At trial, the citizens groups challenged only those sections of the ordinances that prohibited noncommercial door-to-door canvassing and solicitation during evening hours, generally after 5 p.m. or 6 p.m. or sunset, and that required prospective solicitors to be fingerprinted. They do not challenge the municipalities' right to bar canvassing after 9 p.m.[3]
 
 
 6
 After hearing extensive testimony from both sides, the district court issued an opinion containing detailed findings of fact and conclusions of law in which it found that "the preponderance of evidence indicates that the time restrictions on canvassing do not deter or prevent crime in these municipalities as a matter of fact," App. at 32, and that the "preponderance of the evidence ... indicates that these plaintiffs do not have meaningful alternatives to evening canvassing ... [because] plaintiffs c[an] not survive economically if the restrictions at issue remain in place." App. at 33.
 
 
 7
 The court thus found that "the preponderance of the evidence ... weighs rather heavily in the direction of the plaintiffs...." App. at 32. However, the court felt "constrained" to hold that the prohibition of evening canvassing was constitutional because of this court's decision in Pennsylvania Alliance for Jobs & Energy v. Council of the Borough of Munhall (PAJE), 743 F.2d 182 (3d Cir.1984), which the district court read as holding that "restrictions on door-to-door canvassing which prohibit such activity after dark or after 5:00 p.m. are per se facially reasonable." App. at 30.
 
 
 8
 Turning to the fingerprinting requirements, the district court found that "there is no evidence on this record that canvassers have been involved in criminal activity...." App. at 35-36. Again, however, the court found itself circumscribed by prior decisions of this court to uphold the regulation if it was "reasonably related" to a valid state interest. Therefore, the court rejected plaintiffs' challenges to these regulations as well.
 
 
 9
 The court refused the citizens groups' request to retain jurisdiction over their claims that other provisions of the ordinances are also unconstitutional, holding that the issues had not been preserved.[4] Finally, the court declined to exercise pendent jurisdiction over the state constitutional claim. Plaintiffs do not challenge these rulings on appeal.
 
 
 10
 The citizens groups appeal,[5] claiming first that the district court misconstrued the law in this circuit, and that the district court's factual findings required it to hold the hours restrictions unconstitutional. Second, plaintiffs contend that the fingerprinting requirement is not governed by a reasonable relation test, and that, under the proper, more stringent analysis, the fingerprinting requirement is unconstitutional. On appeal, this court granted the motion of the Pennsylvania Public Interest Coalition, Republican City Committee of Philadelphia, Americans for Democratic Action of Southeastern Pennsylvania, and Friends of Bob Edgar [the Democratic Party's candidate in Pennsylvania for the United States Senate] to file an amici curiae brief. The amici urge reversal, arguing in their joint brief that "their ability to function--for some perhaps even their survival--is at issue." Brief of Amici at 1.
 
 II.
 THE ORDINANCES
 
 11
 A brief description of the challenged ordinances, which include a potpourri of exclusions, may be helpful to an understanding of the relevant legal issues. Each limits the hours during which door-to-door soliciting and canvassing can occur, but there are some variations. North Arlington prohibits canvassing between 5 p.m. and 9 a.m. and on legal holidays, Sundays and during the month of December. Woodbridge prohibits canvassing during these same hours, but without any daily or monthly restrictions. However, "[c]ertain charitable, religious, and historical societies," defined by reference to state law, are exempted from some aspects of the ordinance. Woodcliff Lake's ordinance likewise restricts canvassing to between 9 a.m. and 5 p.m. and prohibits canvassing altogether on Sundays. The ordinance contains an exception for "[a]ny person soliciting votes for a bona fide candidate for public office." In addition, the ordinance vests in the Mayor and Council of the town the power to suspend the provisions of the ordinance with respect to nonprofit organizations. Harrington Park's ordinance as attached to the complaint also prohibits canvassing after 5 p.m. and on Sundays and holidays, although the district court found that the curfew was sunset. The ordinance excludes from its licensing provision "nonprofit, religious, charitable, civic, or veterans' organizations" if those organizations file an application and are found to be "bona fide" by the Borough's police department.
 
 
 12
 When this suit was filed, Paramus permitted canvassing only on weekdays from 9 a.m. to 6 p.m., but the district court noted that it has since amended its ordinance to allow canvassing on Saturdays. See App. at 34 n. 21. The Paramus ordinance contains an exception for "peddlers of food" who are allowed to operate from 9 a.m. to 9 p.m., seven days a week.
 
 
 13
 Piscataway prohibits solicitation and canvassing after sunset. Although Piscataway's hours limitation appears to apply only to "hawkers and peddlers," and not to "solicitors, canvassers, and itinerant vendors," the district court did not distinguish between Piscataway's ordinance and the others.
 
 
 14
 Five of the municipal ordinances submitted to this court require solicitors and canvassers to be fingerprinted as a condition for obtaining a license to operate. Woodcliff Lake's ordinance gives the Borough's police department discretion to require fingerprinting if it "determines that fingerprints are necessary for proper identification." However, at the March 27, 1984 hearing, counsel for Woodcliff Lake and North Harrington stated that neither would enforce the fingerprint requirement against plaintiffs.
 
 III.
 THE HOURS LIMITATION
 A. Standard to be Applied
 
 15
 The parties do not dispute the underlying legal premise that door-to-door canvassing and solicitation are protected by the First Amendment, and that this protection is not diminished because the canvassers seek funds as well as adherents. See Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 632, 100 S.Ct. 826, 833-34, 63 L.Ed.2d 73 (1980). Indeed, the Supreme Court has suggested that door-to-door canvassing is entitled to "special solicitude" because it is "much less expensive" than alternative forms of communication. See Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 812 n. 30, 104 S.Ct. 2118, 2133 n. 30, 80 L.Ed.2d 772 (1984). Despite this solicitude, it is also undisputed that a municipality may subject door-to-door solicitation to reasonable time, place, and manner restrictions that are content neutral. See Hynes v. Mayor and Council of Borough of Oradell, 425 U.S. 610, 616-17, 96 S.Ct. 1755, 1758-59, 48 L.Ed.2d 243 (1976); PAJE, 743 F.2d at 185. Ordinarily, when a statute or other government action is alleged to infringe on the exercise of First Amendment rights, the state or municipality bears the burden of demonstrating the constitutionality of the action. See Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577-78, 29 L.Ed.2d 1 (1971); see also Wisconsin Action Coalition v. City of Kenosha, 767 F.2d 1248, 1257 (7th Cir.1985). The question before us is whether the municipalities have satisfied their burden of showing that these ordinances are valid time, place, and manner regulations.
 
 
 16
 The Supreme Court has never addressed the constitutionality of regulation of the hours of canvassing and solicitation.[6] See Note, Strangers in the Night: Ordinances Restricting the Hours of Door-to-Door Solicitation, 63 Wash.U.L.Q. 71, 72 (1985). There is a difference among the Courts of Appeals over the proper standard to apply to time, place, and manner restrictions of ordinances regulating the hours of door-to-door solicitation. Some courts, notably the Second, Seventh, and Eighth Circuits, hold that the hours regulation must be the least restrictive means of accomplishing the municipal purpose, on the theory that such a test effectuates the requirement that regulations that have an impact on First Amendment values must be drawn with precision. See City of Watseka v. Illinois Public Action Council, 796 F.2d 1547 (7th Cir.1986); Wisconsin Action Coalition v. City of Kenosha, 767 F.2d 1248, 1257 (7th Cir.1985); Association of Community Organizations for Reform Now v. City of Frontenac, 714 F.2d 813, 818 (8th Cir.1983); New York City Unemployed and Welfare Council v. Brezenoff, 677 F.2d 232, 237-39 (2d Cir.1982). As the Seventh Circuit has stated, "If there is a less restrictive alternative to a challenged regulation, then the regulation appears to unnecessarily interfere with First Amendment activity and is not as narrowly drawn as it could be." Wisconsin Action Coalition v. City of Kenosha, 767 F.2d at 1255; see also West Virginia Citizens Action Group, Inc. v. Daley, 324 S.E.2d 713, 721-25 (W.Va.1984).
 
 
 17
 On the other hand, it is settled in this court, in an opinion that is binding on us, that such ordinances will be upheld "if they are imposed 'without reference to the content of the regulated speech, ... serve a significant governmental interest, and ... leave open ample alternative channels for communication....' " PAJE, 743 F.2d at 185 (quoting Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981)). In PAJE, we also stressed that "regulations of door-to-door canvassing must be precisely drawn to serve the interests they are designed to further." PAJE, 743 F.2d at 187 (emphasis added) (citing Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 104 S.Ct. 2839, 2853, 81 L.Ed.2d 786 (1984) and Village of Schaumburg, 444 U.S. at 637, 100 S.Ct. at 836). Although this may be considered as a separate factor in evaluation of a statute's constitutionality, we view it as relevant to the second inquiry, that which focuses on the manner in which the regulation serves the government interest.
 
 
 18
 Plaintiffs do not argue that the ordinances must be evaluated under the standard applied to regulations that are not content neutral, thus conceding that the first Heffron factor has been satisfied. They challenge the district court's conclusion as to the remaining two factors. They argue that the district court improperly deferred to the municipalities' legislative judgment in holding that the regulations precisely serve the legislative goals, and that the district court misconstrued the decision in PAJE to compel a holding that the availability of certain other modes and times of communication are per se adequate alternatives to evening canvassing.
 
 
 19
 B. Is the Regulation Precisely Tailored to Serve Government Interests?
 
 
 20
 As we suggested earlier, there are two components to the second Heffron factor. The first is whether the government interest asserted is a substantial one. The second looks to how that interest is served by the regulation in question.
 
 
 21
 The municipalities assert that the hours regulations are justified by the government interests in preventing or deterring crime and protecting the legitimate privacy expectations of citizens at home. The district court found these interests to be substantial. That holding is consistent with our earlier opinion in PAJE, 743 F.2d at 187, and with the Supreme Court's recognition of the "important interests" served when a municipality seeks "to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing." Hynes v. Mayor of Oradell, 425 U.S. at 616-17, 96 S.Ct. at 1758-59.
 
 
 22
 The mere assertion of substantial government interests is not enough to satisfy the second Heffron factor. A valid time, place, and manner regulation must also "serve" that significant governmental interest. Heffron, 452 U.S. at 649, 101 S.Ct. at 2564-65. In Heffron, the Supreme Court upheld the limitation of groups distributing and selling literature and soliciting funds to fixed locations at a fairgrounds, in part because there had been a finding, based on stipulated facts, that the state interest in the orderly movement of a large crowd and in avoiding congestion was significantly furthered by the limitation. Id. at 645-46, 651, 101 S.Ct. at 2562-63, 2565-66.
 
 
 23
 In this case, however, the district court made no such finding. On the contrary, it found "that ... the preponderance of the evidence indicates that the time restrictions on canvassing do not deter or prevent crime as a matter of fact." App. at 32. Despite this finding, the district court construed this court's precedent to mean that "a facially reasonable relation between the restrictions and the asserted state interests is all that is required." App. at 32. The court based this standard partially on its conclusion that " 'the legislative judgment that [its] goals are advanced by an ordinance is deferred to unless it is facially unreasonable.' " Id. at 30 (quoting Frumer v. Cheltenham Township, 709 F.2d 874, 877 (3d Cir.1983)). The citizens groups argue that Frumer should not be read so broadly.
 
 
 24
 Frumer did not involve door-to-door canvassing but a township restriction on affixing temporary signs to utility poles, street signs, or other structures within the right-of-way of public streets or highways. In upholding the denial of a preliminary injunction, we noted that the district court had concluded that the ordinance serves significant governmental interests in traffic safety and community aesthetics. We rejected the plaintiff's challenge to the district court's conclusion, pointing out that the municipality need not establish this fact by empirical data. Id. at 877. It was in that context that we stated that "the legislative judgment that such goals are advanced by an ordinance is deferred to unless it is facially unreasonable." Id. We cited Metromedia, Inc. v. San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), where the plurality stated that it would "hesitate to disagree" with the widespread legislative judgment that billboards pose a threat to traffic safety in the absence of evidence that that judgment was unreasonable. Id. at 509, 101 S.Ct. at 2893. See also City of Renton v. Playtime Theaters, Inc., --- U.S. ----, 106 S.Ct. 925, 931, 89 L.Ed.2d 29 (1986) (municipality "was entitled to rely on the experiences of" other cities, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses").
 
 
 25
 We do not read Frumer as suggesting more than that a facially reasonable legislative judgment that a significant governmental interest will be advanced by certain measures is enough to satisfy the government's initial burden to demonstrate the constitutionality of the statute under challenge. Nothing in Frumer suggests that the legislative judgment that the means chosen will serve the end is irrebuttable. Thus, Frumer cannot support the expansive reading given it by the district court.
 
 
 26
 We turn next to our later decision in PAJE, which, like the case before us, concerned a challenge to prohibition of evening hours canvassing and solicitation. Unlike this case, there was no hearing in PAJE, and the district court entered summary judgment for defendants sustaining the ordinance. The PAJE district court had found, presumably on the basis of unrebutted affidavits, "that each of the towns established a significant incidence of burglary and home invasion." PAJE, 743 F.2d at 187. The majority further indicated that a canvasser had been "involved in burglary and other crime." Id. We thus construe the statements in PAJE that "[t]he bans of door-to-door canvassing after dark directly and precisely serve the towns' interest in preventing crime" and "directly further the towns' interest in protecting the privacy of their residents," PAJE, 743 F.2d at 187, as an affirmation that the government met its burden to sustain the ordinance by producing this evidence. Judge Becker, in his dissent, disagreed that the record supported such a conclusion, id. at 191, but we are bound by the majority's holding that evidence of this quantum satisfies the government's burden.
 
 
 27
 In neither Frumer nor PAJE did we refer to any evidence produced by plaintiffs to rebut the defendants' showing "that the ordinances are precisely tailored to serve the towns' substantial interests in preventing crime and protecting the privacy of their residents." Id. at 187. Therefore, we cannot accept the district court's conclusion here that it was bound by Frumer and PAJE to reach the same conclusions on the "precisely tailored" issue notwithstanding ample rebutting evidence and its own factual findings.
 
 
 28
 The courts must give great deference to the legislative assumption of facts underlying the statute or ordinance at issue. However, even when a fundamental interest is not at issue, the legislative judgment is not accorded the per se validity that the district court applied here, and legislative findings unsupported by the evidence may be overturned. See, e.g., City of Cleburne v. Cleburne Living Center, --- U.S. ----, 105 S.Ct. 3249, 3260, 3262, 87 L.Ed.2d 313 (1985). It follows that when, as here, fundamental free speech interests are patently burdened, the district court not only is free to but indeed is required to overturn regulations that are premised on legislative assumptions contradicted by facts in the record.
 
 
 29
 It remains to be determined whether the district court's findings that the evidence underlying the relationship between canvassing limitations and deterrence or prevention of crime was "weak", App. at 19, and that "the 'preponderance of the evidence indicates that the time restrictions on canvassing do not deter or prevent crime in these municipalities as a matter of fact' ", App. at 32, are clearly erroneous.
 
 
 30
 The district court relied in part on plaintiffs' expert evidence that, in the district court's words, "there was absolutely no correlation between the existence of canvassing ordinances in the defendant municipalities and the incidence of crime there." App. at 19-20 (emphasis added). The expert testified that in suburban areas, where most canvassing occurs, most burglaries occur during the day when more homes are vacant, Transcript (Tr.) for 3/27/85 at 90, and most crimes against property are committed by residents of the community in which the crime occurs and not by outsiders. Id. at 92.
 
 
 31
 One of defendants' witnesses, the police chief of North Arlington, admitted that he did not know how restrictions of canvassing prior to 9 p.m. deterred crime. See Tr. for 7/18/85 at 113. Defendants produced no evidence to support a correlation between canvassing and crime, no evidence that a canvasser had ever committed any crime in these municipalities other than a violation of an anti-canvassing ordinance, no evidence that the municipalities face a heightened crime rate, and no evidence of the experiences of or studies conducted by other towns.
 
 
 32
 Therefore, the district court's own factual findings that there was no correlation between the ordinances and crime prevention and that the time restrictions on canvassing do not deter or prevent crime are supported by the record. These findings compelled the conclusion that the evening hours restrictions on canvassing and solicitation were not precisely tailored to serve the municipalities' legitimate interest in deterrring crime.
 
 
 33
 The second state interest asserted to justify the hours regulation is the municipalities' interest in protecting the privacy of their residents. Several facts are significant in connection with our consideration of this interest. First, all of the ordinances except North Arlington's contain some exceptions. This means that the ordinances "protect[ ] privacy only by reducing the total number of solicitors" or door-to-door merchants, see Village of Schaumburg, 444 U.S. at 638, 100 S.Ct. at 837, a result which the Supreme Court has found insufficient to support a regulation of door-to-door solicitation. Id. at 639, 100 S.Ct. at 837.
 
 
 34
 Second, the record is inconclusive as to the uniformity of the public desire not to be bothered by solicitors in the evening. See App. at 21. Several police officers testified that, based on the number of complaints they had received, people do not like to be bothered in the evening, but the canvassers for the citizens groups testified that they were warmly received by the majority of the people they talked to while canvassing. Moreover, statistics presented by NJCA showed that only about five percent of the responses received by NJCA canvassers were "openly hostile", and that 66 percent of those contacted between 8 p.m. and 9 p.m. signed NJCA petitions. See App. at 66-67.
 
 
 35
 We do not deprecate the importance of a resident's right to be left alone. "Preserving the sanctity of the home ... is surely an important value," Carey v. Brown, 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980) (cited in PAJE, 743 F.2d at 187), and a municipality may draft an ordinance "aimed at the protection of the householders from annoyance, including intrusion upon the hours of rest." Martin v. City of Struthers, 319 U.S. 141, 144, 63 S.Ct. 862, 864, 87 L.Ed. 1313 (1943). Here, however, the ordinances go beyond the usual "hours of rest" by prohibiting canvassing in the early evening.
 
 
 36
 An inquiry into the manner in which the ordinances serve the public interest requires the courts to determine whether the state interest advanced by the regulation "is sufficiently substantial to justify the effect of the ordinance on [the speaker's] expression." Taxpayers for Vincent, 466 U.S. at 805, 104 S.Ct. at 2129. As the Court has reiterated, the regulation must be "precisely tailored." Where, as here, the record shows that many residents do not object to and indeed some warmly receive canvassers during the evening, it is difficult to sustain a conclusion that a complete ban of evening solicitation is "precisely tailored" or that the interest of some residents in privacy should overcome the important First Amendment rights of door-to-door canvassers and solicitors.
 
 
 37
 Moreover, it is evident that a "precisely tailored" regulation can readily be drafted. Municipalities seeking to protect the privacy rights of their residents who strongly object to solicitation at any time may enact ordinances that require canvassers to observe the individual resident's signs indicating that solicitors are not welcome. See, e.g., ACORN v. City of Frontenac, 714 F.2d 813, 819 (8th Cir.1983). See also Martin v. City of Struthers, 319 U.S. at 147-48, 63 S.Ct. at 865-66 (referring to alternatives of trespass laws punishing persons who enter property after warning to keep off); cf. Rowan v. United States Post Office Department, 397 U.S. 728, 736-38, 90 S.Ct. 1484, 1490-91, 25 L.Ed.2d 736 (1970) (householder may bar unwanted mail). The citizens groups conceded at oral argument that such an ordinance was constitutionally unobjectionable.
 
 
 38
 Nothing in PAJE suggests that if the ordinance there had not been found to serve the interest in deterrence of crime, as in this case, the interest in the protection of privacy would alone have justified the broad restrictions of First Amendment rights. The PAJE court was not faced with that issue, as we are.
 
 
 39
 Given the record in this case, and cognizant of the interests involved, we believe the district court was obliged to find that the regulations precluding canvassing before 9 p.m. are not precisely tailored to serve the state interests asserted to support them.
 
 
 40
 Judge Weis in his dissent does not argue that the restriction on evening canvassing can be sustained under the First Amendment. Nor does he argue that the district court's findings that the time restrictions do not deter or prevent crime in the municipalities and that there are no meaningful alternatives to evening canvassing are not supported in the record. Nonetheless, he argues that we are not free to examine the constitutionality of the ordinances, notwithstanding the facts that no Supreme Court case has yet ruled on this issue and that the only prior decision in this court was based on a substantially different record on the determinative facts.
 
 
 41
 He reaches this surprising position on the theory that we are bound by what he regards as the "constitutional facts" found by the PAJE court on the questions "whether these regulations will prevent crime, protect privacy, and leave open adequate alternative forms of communication." Dissent, infra at 1269. We respectfully disagree that these are constitutional facts, that the PAJE court found them to be generally applicable, and that we are bound thereto.
 
 
 42
 A "constitutional fact" should not be defined, as the dissent suggests, as "unproven (and often unprovable) generalizations that ... are sometimes little more than assumptions or widely-held beliefs [and] which do not have the definiteness associated with narrative facts." Id. at 4. Instead, a constitutional fact is more properly defined as a fact whose "determination is decisive of constitutional rights." Bishin & Stone, Constitutional Facts, reprinted in R. Aldisert, The Judicial Process 704 (1976). The assumptions in the Supreme Court cases about a possible nexus between crime and canvassing were hardly determinative of constitutional rights, since in both cases the Supreme Court held that the regulations at issue violated the canvassers' constitutional rights. See Hynes v. Mayor of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943).
 
 
 43
 In general, "constitutional litigation demands fact analysis of the most particularized kind." Karst, Legislative Facts in Constitutional Litigation, 1960 Sup.Ct.Rev. 75, 75. In the First Amendment area especially, the Supreme Court has stressed the need for "a particularized inquiry into the nature of the interests at stake." Metromedia, 453 U.S. at 503, 101 S.Ct. at 2890. It is questionable whether "assumptions and widely-held beliefs" have a role to play in such an analysis.
 
 
 44
 As we explained above, in the PAJE case the court merely held that the evidence submitted by the government there was sufficient to satisfy its burden to sustain the ordinance in the absence of any genuine issue of material fact. Thus, we sustained summary judgment. Surely, that meager record produced before that district court cannot be considered to have foreclosed all future litigation anywhere else in this circuit on this issue no matter how compelling the facts produced by the challengers of an ordinance. In any event, "[w]here the legislative facts of the earlier case concerned only the immediate parties, generalized findings are entitled to less respect in later cases." Karst,supra, at 108. As the Supreme Court stated in United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).
 
 
 45
 Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice ... the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist.
 
 
 46
 Id. at 153, 58 S.Ct. at 784; see also Karst, supra, at 108 ("counsel must be given the opportunity to show that earlier findings fail to describe present fact").
 
 
 47
 The Seventh Circuit has recently applied this principle in the context of an ordinance limiting hours of solicitation in City of Watseka v. Illinois Public Action Council, 796 F.2d 1547 (7th Cir.1986). It had previously held such an ordinance invalid in Wisconsin Action Coalition v. City of Kenosha, 767 F.2d 1248 (7th Cir.1985). It undertook to analyze fully the validity of a similar ordinance enacted by the City of Watseka, holding that the outcome was not controlled by the Kenosha decision because a different factual record had been adduced in the Watseka case. 796 F.2d at 1551. Only after a full consideration, did it find that the Watseka ordinance was also invalid under the First Amendment.
 
 
 48
 Finally, notwithstanding the dissent's statement to the contrary, nothing in this opinion overrules the PAJE opinion to which we have scrupulously adhered. Nothing in our Internal Operating Procedures bars a subsequent panel from reaching a different conclusion on a different factual record, and we have frequently done so.
 
 
 49
 We appreciate the intuitive impression, possibly unjustified in fact, that the presence of strangers on the street, particularly in small communities, may augur a crime problem. This intuition may underlie the PAJE holding, since the court in PAJE, 743 F.2d at 187, quoted from that portion of Martin v. City of Struthers where the Court stated:
 
 
 50
 In addition, burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later. Crime prevention may thus be the purpose of regulatory ordinances.
 
 
 51
 319 U.S. at 144, 63 S.Ct. at 864 (footnote omitted). Significantly, the ordinance in Struthers was nonetheless held unconstitutional by the Supreme Court.
 
 
 52
 Also, because a decision on whether the significant and legitimate legislative interests are served by an ordinance is dependent upon the facts adduced by the parties, we recognize the possibility of inconsistent results in the district courts, based upon the records in the particular case, until more general parameters are established. This is troublesome, not only because of the appearance of inconsistency but because it may also encourage, rather than discourage, litigation that is divisive to the community.
 
 
 53
 Nonetheless, an appellate court must take the record as it comes, and in this case, the record and the findings compel a different result than that reached in PAJE on whether the ordinance is precisely tailored to serve the legislative interests in deterring crime and protective privacy. In any event, although our holding that the evening restrictions are unconstitutional is fully supported by our conclusion that they are not precisely tailored to serve the interests advanced, we hold in the alternative that the ordinances do not satisfy the final Heffron factor, which looks to whether there are available alternatives for the channels of communication.
 
 
 54
 C. Are There Available Alternative Channels of Communication?
 
 
 55
 The Supreme Court has made clear that "a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." Taxpayers for Vincent, 466 U.S. at 812, 104 S.Ct. at 2134. In addition, the Court has looked at the practicalities of a given situation in determining whether available alternative modes of communication are satisfactory. See Linmark Associates, Inc. v. Township of Willingboro, 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977). Therefore, the inquiry here is not merely whether alternatives exist to door-to-door solicitation in the evenings, but also whether those alternatives constitute an adequate and practical opportunity to convey the same information. See L. Tribe, American Constitutional Law 684 (1978).
 
 
 56
 In this case, the district court found that "[c]anvassing is an effective way to make direct personal contact with the public." App. at 21. The court found that the possible alternatives to door-to-door canvassing, such as direct mail, phone, or shopping mall canvassing, were either "much more expensive", id., or significantly less effective. Id. at 22. Direct mail requires a pre-identified list of people. Canvassing in shopping malls does not permit the canvasser to contact voters in their places of registration.
 
 
 57
 The court further found that if the citizens groups were not permitted to canvass in the evenings, they "would no longer be able to exist." App. at 22. The district court concluded:
 
 
 58
 The preponderance of the evidence on the record ... indicates that these plaintiffs do not have meaningful alternatives to evening canvassing. The uncontradicted testimony is to the effect that plaintiffs could not survive economically if the restrictions at issue remain in place. The economic viability of these grass roots organizations is sufficiently tenuous that the use of more expensive means of reaching the public such as direct mail would be prohibitive to their continued operations. Plaintiffs could not survive economically if canvassing was limited to hours of low home occupancy. Further, in some respects there are no alternatives to door-to-door canvassing.
 
 
 59
 App. at 33-34.
 
 
 60
 In effect, the district court found that none of the alternatives suggested by defendants was adequate. Each of the district court's findings was supported by testimony on the record.[7]
 
 
 61
 Again, the district court did not follow its findings through to their logical conclusion because of its belief that the PAJE decision foreclosed case-by-case determination of alternative channels of communication. See App. at 34. The district court stated:
 
 
 62
 Despite my factual findings in this regard, I am again constrained to conclude that where canvassing is permitted during the day and on Saturdays, the use of parks, shopping centers, telephones and mail are per se adequate alternatives to evening canvassing in this circuit.
 
 
 63
 App. at 29 (citing PAJE, 743 F.2d at 188).
 
 
 64
 In PAJE, the issue of the adequacy or practicality of alternative forms of communication was referred to in one paragraph, where the court stated merely that "none of the ordinances prevent PAJE from conducting personal solicitation in other forums, such as parks and shopping districts, or from proselytizing by telephone or mail." Id. at 188. Apparently there was no evidence in the record on this issue, see id. at 193 (dissenting opinion). As we have construed PAJE, the court held that the existence of other fora, which had not been shown to be unavailable, was a sufficient basis to find that the municipalities had satisfied their burden to show available alternative means of communication. Although the dissent in PAJE believed the defendants had not satisfied their burden, see id. at 194, we are bound by the majority opinion.
 
 
 65
 Nothing in PAJE suggests that when evidence is adduced that supports the district court's finding that the existing channels are inadequate to satisfy the needs of the canvassers, the court is nonetheless compelled to find that there are alternatives that meet the third Heffron inquiry. Such a construction would make a mockery of the inquiry itself. It would mean that even if a political candidate rushing to meet a deadline for signatures of a nominating petition could show that a shopping mall was inadequate for his or her purposes because passersby could not be assumed to reside in the appropriate district, the court would be compelled to find that the mere existence of a shopping mall justified a ban on door-to-door solicitation for signatures in the evening. To state the proposition is to reject it.[8] PAJE does not compel the district court to disregard the evidence and its own factual findings.
 
 
 66
 We caution that our holding is limited to the canvassers and solicitors before us, whose political objective often makes it essential that they personally contact persons at home in their voting districts. We expressly disclaim any necessary applicability to trade solicitation, which may entail different considerations.
 
 
 67
 In summary, we hold that the municipal ordinances at issue in this case unconstitutionally restrict plaintiffs' right to conduct door-to-door soliciting and canvassing because there are no alternative channels of communication that adequately serve their important First Amendment rights.
 
 IV.
 THE FINGERPRINTING REQUIREMENT
 
 68
 The citizens groups also contend that the provisions of some of the ordinances requiring canvassers and solicitors to be fingerprinted as a condition for obtaining a license to operate in the municipalities burden their canvassers in the exercise of their First Amendment rights.[9] Although the district court found that the fingerprinting requirement had interfered with appellants' ability to canvass, it upheld the regulation as "reasonably related to the defendant's [sic] interest in deterring, preventing or prosecuting crime." App. at 34.
 
 
 69
 Neither party has cited us to any case that directly considers the constitutionality under the First Amendment of a fingerprinting requirement for licensing of canvassers,[10] and we have not been able to find one.[11] Thus, this appears to be a question of first impression.[12] However, we are guided by two lines of cases in the Supreme Court: those in which the Court has considered regulations of canvassing, solicitation and distribution of literature, and those in which the Court has considered the effect of disclosure requirements on the exercise of rights protected by the First Amendment.
 
 
 70
 In decisions involving limitations on the right to canvass and solicit, the Court has made clear that a municipality can require some identification from canvassers as a condition to granting a license to operate within the city's boundaries. In Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), Justice Black, writing for the Court, struck down a municipal regulation that prohibited anyone distributing handbills from knocking on doors or ringing doorbells. The Court held that the ordinance was not tailored to serve the governmental interest in deterring crime, reasoning that there are other means of controlling and deterring crime that are less burdensome on a cherished First Amendment activity. Id. at 147-48, 63 S.Ct. at 865-66. Specifically, the Court stated, "A city ... can by identification devices control the abuse of the privilege [to distribute literature to homeowners] by criminals posing as canvassers." Id. at 148, 63 S.Ct. at 866 (footnote omitted); see also Cantwell v. Connecticut, 310 U.S. 296, 306, 60 SCt. 900, 904, 84 L.Ed. 1213 (1940).[13]
 
 
 71
 Later cases have held that door-to-door solicitation is subject to "reasonable regulation" without specifying what a municipality may require as a precondition to solicitation. See Village of Schaumburg, 444 U.S. at 632, 100 S.Ct. at 833-34; Hynes v. Mayor of Oradell, 425 U.S. at 620, 96 S.Ct. at 1760. From these cases, it is apparent that a municipality may impose some type of licensing and identification procedure on those wishing to canvass. It is important to note that plaintiffs here, as door-to-door canvassers, are required by these ordinances to register in advance with the police, and to supply their names, addresses, telephone numbers, and identification, such as a driver's license. These are "requirements to which plaintiffs have absolutely no objections." Appellants' Brief at 46.
 
 
 72
 However, the Court has cautioned that regulations of solicitors and canvassers, including even identification requirements, involve a substantial risk of dampening the exercise of First Amendment activities. In Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Court struck down as facially unconstitutional a Los Angeles ordinance that required any handbill to contain the name of the person who wrote it and the name of the person who caused it to be distributed. The Court observed that requiring speakers to identify themselves was contrary to the tradition of anonymous pamphleteering in the United States, id. at 64-65, 80 S.Ct. at 538-39, and held that there was "no doubt" that the identification requirement at issue "would tend to restrict freedom to distribute information and thereby freedom of expression." Id. at 64, 80 S.Ct. at 538. See also Schneider v. State (Town of Irvington), 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939) (striking down on other grounds an ordinance which, inter alia, required pamphleteers to undergo "a burdensome and inquisitorial examination, including photographing and fingerprinting").
 
 
 73
 In decisions outside of the area of solicitation and canvassing, the Court has stressed the dangers of regulations requiring disclosure of information as a precondition for engaging in First Amendment activities. In National Association for the Advancement of Colored People v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Court held that Alabama's demand that the NAACP reveal the names and addresses of all its rank and file members "entail[ed] the likelihood of a substantial restraint upon the exercise by [the NAACP's] members of their right to freedom of association." Id. at 462, 78 S.Ct. at 1172; see also Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960) (compulsory disclosure of membership lists "would work a significant interference with the freedom of association").
 
 
 74
 More recently, in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), the Court considered the disclosure requirements of the Federal Election Campaign Act. The Act requires disclosure by political parties and individual candidates of certain contributors and contributions. The Court held that such "compelled disclosure" must be justified by a " 'substantial relation' between the governmental interest and the information required to be disclosed." Id. at 64, 96 S.Ct. at 1172 (citing Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 546, 83 S.Ct. 889, 894, 9 L.Ed.2d 929 (1963)). The Court reasoned "that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." Buckley v. Valeo, 424 U.S. at 64, 96 S.Ct. at 656.
 
 
 75
 The Buckley Court upheld the disclosure requirements at issue because it found that the actual impact of the statute on First Amendment rights was "highly speculative." Id. at 70, 96 S.Ct. at 659. However, in Brown v. Socialist Workers '74 Campaign Committee, 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982), the Court unanimously held that the Ohio Socialist Workers' Party had shown that there was a sufficient threat to the exercise of its rights to prevent an Ohio statute's disclosure requirements from being applied to it constitutionally.
 
 
 76
 While these cases do not establish conclusively that the fingerprinting requirement at issue in this case is unconstitutional, they do demonstrate that when identification and disclosure requirements have been shown to burden First Amendment rights, the government must show that there is a substantial relation between the regulation and some legitimate and important state interest.
 
 
 77
 In this case, the district court found that the fingerprinting requirement directly affected the citizens groups in the exercise of their First Amendment rights. The court found that "[m]any of the canvassers for NJCA and [Conservation League] associate fingerprinting with criminality and consider such a requirement stigmatizing, and an inappropriate burden on their right to do political work." App. at 22. In one instance, NJCA was not able to canvass in a particular area after five of seven of its canvassers refused to submit to be fingerprinted because of the air of criminality about it. See App. at 22; Tr. for 3/27 at 150-52. Further, the co-director of NJCA testified that "as a practical experience for canvassers, many canvassers will not be willing to be fingerprinted and, therefore, would not canvass." Tr. for 7/16 at 26. An NJCA supervisor stated that fingerprinting requirements "make[] it more difficult for us to recruit people to canvass." Tr. for 7/18 at 23. In another instance, Paramus Freeze was unable to canvass in Paramus because its volunteers refused to submit to a fingerprinting requirement. See App. at 22; Tr. for 3/27 at 24.
 
 
 78
 This testimony constitutes a showing of a substantial effect on the exercise of the citizens groups' First Amendment right to solicit and canvass. It was therefore error for the district court to hold that the fingerprinting requirements could be upheld if they were reasonably related to the state interests asserted. The burden placed on First Amendment activities by these ordinances required that they withstand more exacting scrutiny.
 
 
 79
 The district court found that the fingerprinting regulations were supported by the municipalities' interest in "deterring, preventing or prosecuting crime." App. at 34. As in the context of the regulation of the hours of solicitation, this interest is indisputably substantial. The court further found, based on defendants' expert testimony, that fingerprinting "acts as a crime deterrent." App. at 24. Finally, it would be difficult to dispute that fingerprinting of canvassers would be useful in the investigation of crimes in which a canvasser or solicitor was suspected of being involved.
 
 
 80
 However, the municipalities must not only show that there is an important state interest, but that there is a substantial relationship between that interest and the regulation. There has been no showing that canvassers and solicitors have a significant history of criminal behavior.
 
 
 81
 The district court has already found that solicitation and canvassing are the only adequate means available to these plaintiffs to spread their message. Defendants' assertion that fingerprinting is no longer stigmatizing is belied by the record that shows that the fingerprinting requirements effectively prevent the plaintiff organizations from espousing their causes to the residents of the municipalities in question. Thus, the burden on First Amendment activity caused by the fingerprinting requirements is simply too heavy to pass constitutional muster in light of the absence of a particularized showing of the needed relationship between the fingerprinting and the asserted state interests.
 
 
 82
 Judge Weis belittles the plaintiffs' objections as involving only "a matter of personal distaste." Dissenting Op. at 1270. However, just as a government could not require a street corner orator or a political pamphleteer to be fingerprinted, it may not, under these circumstances, require solicitors and canvassers to be fingerprinted. We therefore hold that the challenged municipal ordinances may not be constitutionally applied to these plaintiffs.V.
 
 CONCLUSION
 
 83
 Decisions involving the First Amendment often require difficult adjustments of the rights of individuals and the legitimate aims of government. See Niemotko v. Maryland, 340 U.S. 268, 275, 71 S.Ct. 325, 329, 95 L.Ed. 267 (1951) (Frankfurter, J., concurring). This case involves two such decisions. Although we are mindful that municipalities must have some latitude to protect the interests of their residents, we conclude that this is a case in which efforts to do so have trespassed upon one of the most cherished of constitutional rights. Thus, for the reasons set forth above, we hold that, on the basis of the district court's findings that the time restrictions on canvassing do not deter or prevent crime and that the plaintiffs do not have meaningful alternatives to evening canvassing, the defendant municipalities cannot constitutionally forbid plaintiffs from engaging in canvassing and solicitation before 9 p.m., the time period challenged in this case. We further hold that the challenged fingerprinting regulations violate the First Amendment. The order of the district court will be reversed, and the matter remanded for further proceedings consistent with this opinion.
 
 
 84
 WEIS, Circuit Judge, dissenting.
 
 
 85
 The panel procedure used by this and other courts of appeals has proved a highly efficient and intensely practical method of coping with ever-increasing caseloads. However, because appeals are heard by less than a majority of the court, there exists the danger of inconsistency in rulings by different panels. To minimize this risk, a variety of practices have been implemented including circulating opinions to all judges of the court before filing and convening in banc hearings.
 
 
 86
 This court has taken the important step of adopting an Internal Operating Procedure, I.O.P. 8C, declaring the published opinions of a panel binding on all later panels. The overruling of a decision may be accomplished only by a later opinion of the United States Supreme Court or decision of this court sitting in banc.[1] Because I believe that the majority opinion here violates this mandate, I must dissent.
 
 
 87
 The dual interests of crime prevention and privacy are legitimate community concerns justifying reasonable time, place, and manner restrictions on the exercise of some First Amendment rights. Such regulations must be precisely drawn to serve the interest they are designed to further and must preserve adequate alternative channels of communication. Secretary of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).
 
 
 88
 In Pennsylvania Alliance for Jobs and Energy v. Council of the Borough of Munhall, 743 F.2d 182 (3d Cir.1984), a panel of this court ruled that time, place, and manner restrictions almost identical to those at issue here pass constitutional muster. As support for limitations on canvassing, the panel in that case relied on certain propositions--that canvassers often use their activity as a reconnaissance to identify likely targets for burglary, and that homeowners do not desire intrusions during evening hours.
 
 
 89
 These premises have been stated as facts in several Supreme Court opinions. In Martin v. City of Struthers, 319 U.S. 141, 144, 63 S.Ct. 862, 863-64, 87 L.Ed. 1313 (1943), the Court said, "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." In Hynes v. Mayor of Oradell, 425 U.S. 610, 619, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976), the Court quoted with approval Professor Chafee's work, stating that "[o]f all the methods of spreading unpopular ideas, [house-to-house canvassing] seems the least entitled to extensive protection. The possibilities of persuasion are slight compared with the certainties of annoyance. Great as is the value of exposing citizens to novel views, home is one place where a man ought to be able to shut himself up in his own ideas if he desires."
 
 
 90
 In Pennsylvania Alliance, we said: "That unregulated canvassing poses a risk of crime is well known.... The local authorities' task of detecting and preventing burglary would clearly be more difficult if strangers to their communities were permitted to roam from house to house after dark." 743 F.2d at 187. We noted further that privacy interests are "clearly promoted by regulations that protect persons from the annoyance of coping with uninvited solicitors at the dinner hour and in the evening." Id.
 
 
 91
 Observing that the ordinances under consideration permitted "personal solicitation in other forums, such as parks and shopping districts, or ... proselytizing by telephone or mail," id. at 188, we also concluded that these communicative outlets offered adequate alternatives.
 
 
 92
 In the case at hand, the district court determined, on the basis of evidence presented, that time restrictions on canvassing do not prevent crime in the defendant municipalities. On the privacy issue, the court did not reach a firm conclusion, noting only that the "factual record is somewhat more balanced." The district court also found that plaintiffs have no "meaningful alternatives to evening canvassing." These findings contrast sharply with the conclusions in Pennsylvania Alliance. Despite its differing factual findings, however, the district court properly considered itself bound by our earlier ruling.
 
 
 93
 The question arises whether the district court in this case or the Supreme Court in its earlier cases has made the correct "factual findings." On issues like these, touching on the necessity and utility of regulating free speech, answers will usually be subject to debate no matter how many statistical studies may be offered in support of the countervailing arguments.
 
 
 94
 Difficulties arise when courts fail to distinguish "historical or narrative facts," which are definite, fixed, and case-specific, from the body of assertions sometimes characterized as "constitutional facts." The latter are frequently unproven (and often unprovable) generalizations that, once made part of the caselaw, take on a life of their own and have influence beyond the cases in which they are made. Such facts are sometimes little more than assumptions or widely-held beliefs, which do not have the definitiveness associated with narrative facts.[2]
 
 
 95
 The majority is uncomfortable with my frank characterization of some constitutional facts, and my belief that in constitutional cases judges are frequently called upon to exercise judgment in predicting the relative effectiveness of legislation in the absence of any conclusive proof of underlying assumptions. But only candor about this aspect of the judicial function can neutralize the charge, leveled by some, that "manipulation" of constitutional facts from case to case "provides a facade for ... constitutional decisions." Shaman, 35 U.Fla.L.Rev. at 253; see also Aflange, 114 U.Pa.L.Rev. 637.
 
 
 96
 That the circumstances in different cases may lead to differing results is common enough when the facts are historical, narrative, or adjudicatory, since those various labels apply to "facts" pertaining explicitly to the parties before the court. For example, in this case the rate of pay received by canvassers and the number of hours they work are adjudicatory facts.
 
 
 97
 But legislative or constitutional "facts" often play a more crucial role in the judicial process. Whether unregulated conduct of canvassers during the evening hours actually increases the incidence of crime is a matter of constitutional fact. In City of Struthers, the Supreme Court found that canvassing did increase crime, basing its conclusion on a number of studies. The Pennsylvania Alliance case adopted these findings and added its own.[3] On the evidence it heard, however, the district court here disagreed. Similarly, the finding that homeowners desire privacy in the evening hours is a constitutional fact, which the district court questioned despite the views of both the Supreme Court and the Pennsylvania Alliance panel.
 
 
 98
 Constitutional facts are necessarily generalized, in the nature of predictions, and are not limited to any one case. This court's deference in Pennsylvania Alliance to the Supreme Court's observation about burglars often posing as canvassers illustrates that the validity of a constitutional fact, unlike that of an adjudicatory fact, is not confined to the specific dispute under consideration.
 
 
 99
 That is not to say that constitutional facts may not be discarded as faulty in later adjudications. The findings of the Supreme Court in Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), invalidating those in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), are a dramatic example of that process. When judges, legal scholars, and lawyers speak of Brown's effect, however, they cite it as the case which overruled Plessy v. Ferguson, not simply as a decision in which the facts of the particular case showed racial separation to be unequal in the particular circumstances.[4]
 
 
 100
 The constitutional facts supporting a rule or doctrine must necessarily carry precedential weight so that governments will be able to predict the validity of their regulatory actions. Thus, in large part the longevity of constitutional facts may be attributed to the doctrine of stare decisis and the important purposes that principle serves. The Supreme Court recently admonished that "any detours from the straight path of stare decisis in our past have occurred for articulable reasons, and only when the Court has felt obliged 'to bring its opinions into agreement with experience and with facts newly ascertained.' " Vasquez v. Hillery, --- U.S. ----, ----, 106 S.Ct. 617, 625, 88 L.Ed.2d 598 (1986). Clearly, in the Court's view, reconsideration of constitutional facts in light of experience occurs in the deliberate process of overturning constitutional precedents.
 
 
 101
 A degree of generalization about the permissible range of governmental response to a given problem is necessary to avoid endless litigation of these issues. Once the courts have answered the question, municipalities should be able to rely on the constitutional fact that regulating canvassers is a legitimate measure for the prevention of crime. In City of Renton v. Playtime Theatres, Inc., --- U.S. ----, ----, 106 S.Ct. 925, 930-32, 89 L.Ed.2d 29 (1986), the Supreme Court used such an approach:
 
 
 102
 "We hold that Renton was entitled to rely on the experiences of Seattle and other cities ... in enacting its adult theater zoning ordinance. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or to produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses."Although it concedes the need for stability and consistency, the majority has articulated an approach that will require municipalities to make fundamental policy decisions on an ad hoc basis.
 
 
 103
 This case presents a clear conflict on three constitutional facts--whether these regulations will prevent crime, protect privacy, and leave open adequate alternative forms of communication. The conflicts between this case and Pennsylvania Alliance cannot and should not be reconciled by this panel; that is reserved for the full court.
 
 
 104
 The majority's response to my dissent on this phase of the case is largely misdirected. I have no hesitancy in acknowledging that facts play a crucial role in constitutional adjudication, and I agree that this court's prior decision has not foreclosed any further litigation of the issues. My concern is primarily an institutional one--that such reexamination proceed within the framework established by this court's Internal Operating Procedures. The majority's blithe assumption that its opinion can coexist with Pennsylvania Alliance without causing confusion, I believe, is unrealistic and undermines the purposes for which the Internal Operating Procedures were instituted.
 
 
 105
 Inevitably, if the majority's opinion stands, the result will be uncertainty among the district courts in this circuit as to the governing constitutional facts in cases of this nature. Rather than reverse the district court, the majority should submit this case to the full court to determine whether the matter should be heard in banc. The reversal here is contrary to this court's Internal Operating Procedures and frustrates the goal of preventing conflicts between panel decisions. For that reason, I cannot join in the majority's opinion. Because I am convinced that the matter should be resolved by the full court, I take no position on the merits of the panel majority's reasoning in the abstract.[5]
 
 
 106
 I do dissent, however, from the holding that the fingerprint requirement is unconstitutional. The majority does not dispute that the substantial interest in deterring crime justifies some type of identification procedure. The cases cited in which the Supreme Court sustained a First Amendment challenge are those where identification per se was the issue. For example, Brown v. Socialist Workers '74 Campaign Committee, 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982), held that mere disclosure of membership in the Socialist Workers party was a substantial infringement of associational rights under the circumstances.
 
 
 107
 Since plaintiffs here concede that identification may be required, the constitutional question centers on the legitimacy of the means chosen by defendants. Members of the plaintiff organizations have stated their belief that an air of criminality surrounds the fingerprinting process. Perhaps that may have been true at one time; however, millions of persons have been fingerprinted as a routine procedure on entering the armed forces in the last 50 years. That circumstance belies any valid belief that only criminals are subject to this procedure.[6]
 
 
 108
 This court recently upheld against asserted constitutional privacy interests a fingerprint requirement as part of a state regulatory scheme. Trade Waste Management Assn., Inc. v. Hughey, 780 F.2d 221, 234 (3d Cir.1985). There we said, "[fingerprinting] is required only as a condition for obtaining or keeping a license to engage in a business that the state may license. It is, moreover, rationally related to the investigation of the qualifications of licensees."
 
 
 109
 Here, the plaintiffs' objections resolve into no more than a matter of personal distaste for the fingerprint requirement. But the district court found the procedure an effective means of promoting the municipal interest in deterring crime. Some canvassers might have similar personal objections to producing a driver's license, photograph, or other identification. Their preferences would not be honored in that instance and should not be given any greater weight here.
 
 
 110
 In a positive vein, fingerprinting may well remove suspicion from a canvasser at a preliminary stage. In investigating a burglary, if the police discover prints that are not those of canvassers, investigations more intrusive than the brief and simple procedure of supplying the prints will be headed off.
 
 
 111
 The majority states that the fingerprinting of a "street corner orator" would be impermissible under the first amendment. But the rights of those exercising the prerogative of political speech in a traditional public forum are not those presented here. Pennsylvania Alliance made clear from the outset that regulation of door-to-door canvassing does not implicate the public forum doctrine. The canvassers here, who are employees trained and paid for their work, are more like the waste collectors in Hughey, who could be fingerprinted, than the political stump speaker example cited by the majority.
 
 
 112
 The fingerprinting requirement affects the privacy interests of the individual canvassers most directly. The First Amendment rights of New Jersey Citizen Action, plaintiff here, are implicated only in a tangential way because some canvassers have indicated that they will not continue to work if fingerprinting is required. In that sense, the force of the first amendment argument asserted here is tied to the strength of the underlying privacy concerns of the individual canvassers. But under Hughey, those interests are not strong enough to invalidate the municipalities' reasonable non-intrusive fingerprinting requirement.
 
 
 113
 In sum, the majority's reversal of the district court order directly contradicts the holding of a prior published opinion of this court. I am unable to join in such a result, but would vote for in banc consideration to resolve the substantial division in this court. Furthermore, because the non-intrusive process of fingerprinting is fully justified by the municipal interests at stake, and is also supported by a previous panel decision, I dissent from the majority's holding that such a requirement is unconstitutional.
 
 
 
 *
 Hon. Louis H. Pollak, United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The district court granted Paramus Freeze leave to intervene as a plaintiff, pursuant to Fed.R.Civ.P. 24(b)
 
 
 [2]
 Edison Township, Glen Ridge Township, Harrington Park Borough, North Arlington Borough, Town of Nutley, Paramus Borough, Piscataway Township, Roseland Borough, Woodbridge Township, and Woodcliff Lake Borough. After the hearing, and while the matter was under consideration, plaintiffs moved to amend their complaint to seek certification of a defendant class under Fed.R.Civ.P. 23
 
 
 [3]
 By the trial's end, only six municipalities were actively defending the suit. Before testimony was completed, the district court issued a declaratory judgment that Edison's challenged ordinance did not apply to plaintiffs or other noncommercial house-to-house solicitation. While Edison's liability for damages, costs, and attorneys' fees remained in issue, it was no longer involved in the injunction proceeding. Glen Ridge stipulated to the same effect. Both Nutley and Roseland apparently decided not to enforce their ordinances against plaintiffs, but no stipulation to that effect was entered in the district court record
 
 
 [4]
 Some of the other provisions challenged in the complaint are the requirement of Paramus that each applicant for a solicitation license submit a certificate from a Bergen County physician certifying that the applicant is free from contagious, infectious, or communicable diseases; the requirements of Paramus, Piscataway, and Woodbridge for fairly extensive character references from applicants; and the discretion vested in the chief of police of four municipalities to deny canvassing permits on the basis of unspecified criteria
 
 
 [5]
 Six of the ten original defendant municipalities have joined appellees' brief on appeal. These six are Piscataway, Edison, Woodcliff Lake, Paramus, Woodbridge and North Arlington. Appellees' brief states that the Borough of Harrington Park, which actively litigated this matter in the district court, "has advised that it does not wish to participate in this appeal." Appellees' Brief at 1 n. 1. However, because the district court upheld Harrington Park's ordinance, we must consider its constitutionality in this appeal
 
 
 [6]
 In Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), the Court considered an ordinance that allowed solicitation only between the hours of 9 a.m. and 6 p.m., Monday through Saturday. However, this provision apparently was not challenged by plaintiffs in that lawsuit
 
 
 [7]
 The amici make similar representations in their brief. For example, the Philadelphia Republican City Committee states that the canvassing is done by its committeemen who are employed during the day and are not available except in the evening hours. It also states that it has found evening canvassing is more efficient and fruitful than daytime canvassing. Brief of Amici at 2. These representations are consistent with the findings in this case, but we rely only on facts of record
 
 
 [8]
 In Struthers, the Court stated:
 Of course, as every person acquainted with political life knows, door to door campaigning is one of the most accepted techniques of seeking popular support, while the circulation of nominating papers would be greatly handicapped if they could not be taken to the citizens in their homes. Door to door distribution of circulars is essential to the poorly financed causes of little people.
 Martin v. City of Struthers, 319 U.S. at 146, 63 S.Ct. at 865 (footnote omitted).
 
 
 [9]
 The citizens groups challenge the fingerprinting requirement under the Fourth Amendment as well. Although we are unable to discern precisely what they maintain in this respect, we presume that their argument is that fingerprinting under these circumstances constitutes an unreasonable search. Because we think the issue is more easily resolved under the First Amendment, we do not reach the citizens groups' Fourth Amendment contention
 
 
 [10]
 All of the cases cited by the parties relate to challenges arising in a criminal context or relying on other provisions of the Constitution. For example, the municipalities rely on Judge Weinfeld's decision in Thom v. New York Stock Exchange, 306 F.Supp. 1002 (S.D.N.Y.1969), aff'd., 425 F.2d 1074 (2d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), where the court rejected a claim that a New York statute that required fingerprinting of all employees of member firms of national security exchanges was unconstitutional under the due process clause, the equal protection clause, and the Fourth and Ninth Amendments. However, no claim was made that the fingerprinting rule burdened First Amendment rights. Other cases cited by defendants are also inapposite. See, e.g., United States v. Krapf, 285 F.2d 647 (3d Cir.1961) (fingerprinting after a criminal conviction); Walton v. City of Atlanta, 181 F.2d 693 (5th Cir.) (challenge under equal protection clause), cert. denied, 340 U.S. 823, 71 S.Ct. 56, 95 L.Ed. 604 (1950); State ex rel. Mavity v. Tyndall, 224 Ind. 364, 66 N.E.2d 755 (1946) (criminal conviction), appeal dismissed, 333 U.S. 834, 68 S.Ct. 609, 92 L.Ed. 1118 (1948) (per curiam) (dismissed for "want of a substantial federal question"); Moyant v. Borough of Paramus, 30 N.J. 528, 154 A.2d 9 (1959) (challenge under commerce clause); McGovern v. Van Riper, 137 N.J.Eq. 548, 45 A.2d 842 (1946) (criminal arrest); Hamilton v. New Jersey Real Estate Commission, Department of Insurance, 117 N.J.Super. 345, 284 A.2d 564 (App.Div.1971) (challenge under Fourth, Ninth, and Fourteenth Amendments); M. Itzkowitz & Sons, Inc. v. Geraghty, 139 Misc. 163, 247 N.Y.S. 703 (1931) (no provision of Constitution specified)
 
 
 [11]
 In Wulp v. Corcoran, 454 F.2d 826 (1st Cir.1972), the First Circuit struck down an ordinance that required newspaper peddlers to obtain a license on the ground that the identification requirements burdened the exercise of First Amendment rights. The court referred to but did not discuss the police practice of fingerprinting applicants for such licenses. Id. at 828 n. 1. Also noteworthy is the court's opinion in Genusa v. City of Peoria, 619 F.2d 1203, 1216 (7th Cir.1980), where the court invalidated a fingerprinting requirement for applicants for adult bookstore licenses
 The requirement of fingerprinting for employees of establishments serving liquor was upheld in Iacobucci v. City of Newport, 785 F.2d 1354 (6th Cir.1986), but there the court noted that no fundamental constitutional rights were implicated. It relied on the cases upholding fingerprinting as a condition for those seeking business and professional licenses as precedent.
 
 
 [12]
 We reject the district court's conclusion that PAJE "implicitly approved the constitutionality of a licensure provision which requires fingerprinting." App. at 35 (citing PAJE, 743 F.2d at 188 n. 7). The footnote in PAJE on which the district court relied merely cited to the fingerprint requirement in a challenged municipal ordinance while discussing the plaintiff's claim that the ordinance granted municipal officials unfettered discretion. The court did not discuss, much less "implicitly approve," the fingerprinting requirement
 Also, the decision in Trade Waste Management Ass'n, Inc. v. Hughey, 780 F.2d 221 (3d Cir.1985), to which the dissent refers, is inapposite here. In Trade Waste, we upheld a New Jersey law regulating the solid waste disposal industry which required, inter alia, certain officers and employees in the industry to file disclosure statements and submit to fingerprinting. The employees were working on garbage and trash, not exercising their First Amendment rights, and plaintiffs there did not assert that any First Amendment activities were burdened by the fingerprinting. Although we stated that fingerprinting is "personally intrusive", we held that the requirement did not unduly intrude on privacy rights, id. at 234, and relied essentially on cases upholding involuntary fingerprinting requirements under the Fourth Amendment, not the First Amendment.
 
 
 [13]
 In Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), the Court upheld a municipal ordinance that prohibited commercial solicitors and peddlers from going on to private property without having been invited by the owner or resident of the property. The Court relied heavily on the commercial nature of the activity. Since then, the distinction between commercial and noncommercial speech has been narrowed. See Village of Schaumburg, 444 U.S. at 631-32 & n. 7, 100 S.Ct. at 833-34 & n. 7. In any event, the solicitors here are not commercial in the sense used in Breard
 
 
 [1]
 See United States v. Babich, 785 F.2d 415 (3d Cir.1986); Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir.1985)
 
 
 [2]
 For discussions of the significance of "constitutional facts," see Aldisert, The Judicial Process, 703; Davis, Administrative Law Treatise Sec. 15.03; Karst, Legislative Facts in Constitutional Litigation, 1960 Sup.Ct.Rev. 75; Shaman, Constitutional Fact: The Perception of Reality by the Supreme Court, 35 U.Fla.L.Rev., 236 (1983); Alfange, The Relevance of Legislative Facts in Constitutional Law, 114 U.Pa.L.Rev. 637 (1966)
 
 
 [3]
 The majority argues that the Supreme Court's findings of constitutional fact in Hynes v. Mayor of Oradell and Martin v. City of Struthers should not be followed because in those cases the Court invalidated the attempted regulation of first amendment rights. This precise argument was put forward by the dissent in Pennsylvania Alliance and was rejected by the majority in that case. See 743 F.2d at 190-91. Thus, in its significant aspects the dissent in the Pennsylvania Alliance panel has become the opinion of the majority here
 
 
 [4]
 See, e.g., Pollak, Racial Discrimination and Judicial Integrity, 108 U.Pa.L.Rev. 1 (1959)
 
 
 [5]
 City of Watseka v. Illinois Public Action Council, 796 F.2d 1547 (7th Cir.1986), is not contrary to my position because the opinion in that case did not discuss the significance of constitutional facts. The fact that the panel felt the need to distinguish an earlier decision of the court illustrates my concern that the district courts would be required to choose between inconsistent opinions of the court of appeals of their circuit
 
 
 [6]
 Other benign uses of fingerprinting might be cited. For example, some local communities have instituted fingerprint procedures as a means of identifying and protecting young children